[No. A118537. First Dist., Div. One. Oct. 7, 2008.]

BERKELEY POLICE ASSOCIATION, Plaintiff and Respondent, v. CITY OF BERKELEY et al., Defendants and Appellants.

COUNSEL

Manuela Albuquerque, City Attorney, Zach Cowan, Acting City Attorney, Sarah Reynoso, Deputy City Attorney; Meyers, Nave, Riback, Silver & Wilson and Arthur A. Hartinger for Defendants and Appellants.

Alan L. Schlosser and Mark Schlosberg for American Civil Liberties Union Foundation of Northern California as Amicus Curiae on behalf of Defendants and Appellants.

Berry Wilkinson Law Group and Alison Berry Wilkinson for Plaintiff and Respondent.

OPINION

**MARGULIES, J.**—The Berkeley Police Review Commission (PRC) investigates citizen complaints against Berkeley police officers and holds evidentiary hearings on the complaints that are open to the public. The Berkeley Police Association (BPA) filed a petition for writ of mandate against the PRC and the City of Berkeley (collectively, Berkeley) alleging, among other things, that the PRC had a duty to (1) maintain the confidentiality of its investigatory records and findings and close its evidentiary hearings to the public, in accordance with Penal Code[1] section 832.7; and (2) afford all officers subject to PRC investigations and hearings all rights and protections provided by the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.) (PBRA). The trial court granted BPA's petition on both issues. We affirm.

## I.  BACKGROUND

### A.  *Trial Court Proceedings*

BPA filed this challenge to the PRC's citizen complaint procedures in July 2002. The petition alleged, among other things, that the PRC's investigative and public hearing process violated the confidentiality of police officer personnel records under section 832.7, and failed to provide officers with the full panoply of rights guaranteed by the PBRA.[2] The petition languished until August 2006, when the California Supreme Court issued its decision in *Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272 [48 Cal.Rptr.3d 183, 141 P.3d 288] (*Copley Press*). BPA moved promptly thereafter for summary judgment or, in the alternative, for summary adjudication of issues.

The trial court granted BPA's motion in material part, holding that (1) the PRC's open records and hearings were unlawful under section 832.7, as construed in *Copley Press* and other cases; and (2) PRC procedures were subject to the PBRA. The court issued a writ of mandate commanding that Berkeley and the PRC (1) maintain the confidentiality of police officer personnel records in accordance with section 832.7; (2) cease permitting the public to attend PRC complaint hearings or to obtain access to PRC reports, investigations, and findings; and (3) give all police officers subject to PRC investigations and hearings the protections afforded by the PBRA. This timely appeal followed.

### B.  *Factual and Legal Background*

#### 1.  *The Police Review Commission*

Berkeley voters adopted the ordinance creating the PRC in 1973. (See Berkeley Mun. Code, ch. 3.32.) The purpose of the PRC was to "provide for community participation in setting and reviewing Police Department policies, practices and procedures and to provide a means for prompt, impartial and fair investigation of complaints brought by individuals against the Berkeley Police Department." (Berkeley Mun. Code, § 3.32.010.) An appellate court decision rendered shortly after the PRC's creation invalidated provisions of

---

[2] The original verified petition for writ of mandate and complaint for declaratory relief alleged five causes of action. The other three causes of action, including the cause of action for declaratory relief, were dismissed by the time this appeal was filed.

the PRC ordinance that would have (1) given the PRC the power to recommend specific disciplinary actions against individual police officers, (2) prohibited the Berkeley Police Department from conducting its own internal investigations and disciplinary proceedings, and (3) given the PRC the right to demand and receive information from the police department or other city departments. (See *Brown v. City of Berkeley* (1976) 57 Cal.App.3d 223, 233–235 [129 Cal.Rptr. 1] (*Brown*).)

The PRC is comprised of nine volunteer members who are each appointed to two-year terms by one of the nine members of the city council. Under the PRC regulations, the filing of a written complaint triggers the PRC investigation process. The PRC must promptly notify the chief of police and the accused officer of the substance of the allegations and that the matter is under investigation. A PRC staff investigator obtains a copy of all relevant police reports and other documents from the police department, and conducts taped interviews of the complainant and any cooperating witnesses. The accused officer is also required to cooperate with the PRC investigation and to submit to an interview at which he or she may have representation.[3] The officer is given a written admonishment from the city manager directing the officer to cooperate in the investigation. The PRC provides the accused officer with all of the protections of the PBRA during the prehearing investigation, although it contends it is not legally required to do so.

After the interviews are completed, the investigator prepares a written investigative memorandum containing (1) a copy of the police department procedures or regulations, or other relevant law, allegedly violated by the officer; (2) transcribed copies of all interviews conducted by the PRC investigator; and (3) a copy of the police report or other documentation relevant to the incident. The investigative memorandum is provided to the PRC and a copy is given to the accused officer. A board of inquiry hearing is then scheduled.

A board of inquiry is comprised of three PRC commissioners who review the investigative memorandum, hear testimony from the parties, and render findings on the allegations. In addition to the subject officer, the complainant also must be present at the hearing and may be represented by counsel or other representative. Board of inquiry hearings are usually held in the evening and are open to the public unless the board unanimously decides to close the hearing to protect the rights and privacy of individuals. According to a 2004 declaration submitted by Barbara Attard, a seven-year PRC officer, "Very few

---

[3] Accused officers were first required to appear before the PRC by written directive of the city manager issued in July 1983.

hearings are closed because the public nature of the PRC's hearings is essential to ensuring the public's confidence that their complaints are handled fairly."

The complainant must put on his or her case first. After the complainant has finished, the subject officer is given the opportunity to present his or her case. Both sides have the option of resting on their statements to the PRC investigator rather than offering further testimony. All parties and witnesses are subject to cross-examination by the other side and to questioning by the PRC commissioners. Both sides have an opportunity to present closing argument, following which the board of inquiry adjourns to deliberate in private and determine its findings. After deliberation, the board of inquiry announces its findings on each allegation, which can be "exonerated," "unfounded," "not sustained," or "sustained." Written findings are issued shortly after the hearing and copies are sent to the complainant, the subject officer, the city manager, and the chief of police.

When a new PRC complaint is filed, a file is opened and maintained under the name of the citizen complainant.[4]

## 2. *The Internal Affairs Bureau*

A year after the PRC was created, the Legislature adopted section 832.5, which read as follows: "Each sheriff's department and each city police department in this state shall establish a procedure to investigate citizens' complaints against the personnel of such departments, and shall make a written description of the procedure available to the public." (See Historical Note, 50 West's Ann. Pen. Code (1985 ed.) foll. § 832.5, p. 325.) In 1978, the Legislature enacted Statutes 1978, chapter 630, which amended section 832.5, and added sections 832.7 and 832.8 to the Penal Code and section 1043 to the Evidence Code. (Stats. 1978, ch. 630, §§ 1, 4–6, pp. 2082–2083.) The new provisions required that records pertaining to citizen complaints against officers be kept for at least five years, and provided that (1) peace officer "personnel records," as defined in section 832.8; (2) records maintained pursuant to section 832.5; and (3) "information obtained from" either category of records, were "confidential and shall not be disclosed in any criminal or civil proceeding" (§ 832.7, subd. (a)) except in accordance with a special discovery procedure set forth in newly enacted Evidence Code section 1043. (See 50 West's Ann. Pen. Code (1985 ed.) §§ 832.5, 832.7, 832.8; 29B pt. 3 West's Ann. Evid. Code (1995 ed.) § 1043, p. 404.) Although these

---

[4] Although the PRC's records and files are required by the PRC ordinance to be available for public inspection, it is not clear from the record whether its open investigative files come within this requirement.

statutes have been amended multiple times since 1978, all of the key provisions of the 1978 legislation have been maintained intact.[5,6,7,8]

---

[5] Section 832.5 now reads in relevant part as follows: "(a)(1) Each department or agency in this state that employs peace officers shall establish a procedure to investigate complaints by members of the public against the personnel of these departments or agencies, and shall make a written description of the procedure available to the public. [¶] . . . [¶] (b) Complaints and any reports or findings relating to these complaints shall be retained for a period of at least five years. All complaints retained pursuant to this subdivision may be maintained either in the peace or custodial officer's general personnel file or in a separate file designated by the department or agency as provided by department or agency policy, in accordance with all applicable requirements of law. . . . [¶] (c) Complaints by members of the public that are determined by the peace or custodial officer's employing agency to be frivolous, as defined in Section 128.5 of the Code of Civil Procedure, or unfounded or exonerated, or any portion of a complaint that is determined to be frivolous, unfounded, or exonerated, shall not be maintained in that officer's general personnel file. However, these complaints shall be retained in other, separate files that shall be deemed personnel records for purposes of the California Public Records Act . . . and Section 1043 of the Evidence Code."

[6] Section 832.7 now reads in relevant part as follows: "(a) Peace officer or custodial officer personnel records and records maintained by any state or local agency pursuant to Section 832.5, or information obtained from these records, are confidential and shall not be disclosed in any criminal or civil proceeding except by discovery pursuant to Sections 1043 and 1046 of the Evidence Code [with exceptions not applicable here]. . . . [¶] (b) Notwithstanding subdivision (a), a department or agency shall release to the complaining party a copy of his or her own statements at the time the complaint is filed. [¶] (c) Notwithstanding subdivision (a), a department or agency that employs peace or custodial officers may disseminate data regarding the number, type, or disposition of complaints (sustained, not sustained, exonerated, or unfounded) made against its officers if that information is in a form which does not identify the individuals involved. [¶] (d) Notwithstanding subdivision (a), a department or agency that employs peace or custodial officers may release factual information concerning a disciplinary investigation if the officer who is the subject of the disciplinary investigation, or the officer's agent or representative, publicly makes a statement he or she knows to be false concerning the investigation or the imposition of disciplinary action. Information may not be disclosed by the peace or custodial officer's employer unless the false statement was published by an established medium of communication, such as television, radio, or a newspaper. Disclosure of factual information by the employing agency pursuant to this subdivision is limited to facts contained in the officer's personnel file concerning the disciplinary investigation or imposition of disciplinary action that specifically refute the false statements made public by the peace or custodial officer or his or her agent or representative."

[7] Section 832.8, which has not been substantively amended since 1978, reads as follows: "As used in Section 832.7, 'personnel records' means any file maintained under that individual's name by his or her employing agency and containing records relating to any of the following: [¶] (a) Personal data, including marital status, family members, educational and employment history, home addresses, or similar information. [¶] (b) Medical history. [¶] (c) Election of employee benefits. [¶] (d) Employee advancement, appraisal, or discipline. [¶] (e) Complaints, or investigations of complaints, concerning an event or transaction in which he or she participated, or which he or she perceived, and pertaining to the manner in which he or she performed his or her duties. [¶] (f) Any other information the disclosure of which would constitute an unwarranted invasion of personal privacy."

[8] Evidence Code section 1043 provides in relevant part: "(a) In any case in which discovery or disclosure is sought of peace or custodial officer personnel records or records maintained pursuant to Section 832.5 of the Penal Code or information from those records, the party

A report by the Senate Committee on the Judiciary indicated that the main purposes of the 1978 legislation were to curtail deliberate record-shredding practices by police agencies and to end discovery abuses that were allegedly occurring in the wake of the California Supreme Court's decision in *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] (*Pitchess*). (*San Francisco Police Officers' Assn. v. Superior Court* (1988) 202 Cal.App.3d 183, 189–190 [248 Cal.Rptr. 297].) *Pitchess* had held that police personnel records were discoverable by a criminal defendant being prosecuted for battery against police officers to show that the officers had a history of using excessive force and that he acted in self-defense. (*Pitchess*, at p. 534.) The 1978 legislation sought "to provide retention of relevant records while imposing limitations upon their discovery and dissemination." (*San Francisco Police Officers' Assn. v. Superior Court*, at p. 190.)

To comply with sections 832.5 and 832.7, the Berkeley Police Department established an internal affairs bureau (IAB) complaint process to receive and investigate citizen complaints about officers.[9] IAB investigations are completely confidential, involve no public hearings, and are conducted at all stages in full compliance with the procedural protections of the PBRA. The PRC provides the Berkeley Police Department with a copy of all citizen complaints of misconduct by officers. The IAB conducts its own independent investigation of all PRC complaints, but the IAB never provides the PRC with any documents, information, or findings obtained or developed in the course of the IAB's investigation. The IAB process culminates in a decision by the chief of police as to whether the charges should be sustained and, if so, what discipline to impose. Although the PRC gives the police chief a copy of all final PRC findings, the PRC has no authority itself to impose or recommend discipline, consistent with the *Brown* decision. In a 2006 declaration submitted to the trial court, Berkeley's police chief averred that during his 17 years of experience with the IAB "no Berkeley Police Chief nor the City Manager ever took disciplinary action against an officer based on PRC

---

seeking the discovery or disclosure shall file a written motion with the appropriate court or administrative body upon written notice to the governmental agency which has custody and control of the records. . . . [¶] (b) The motion shall include . . . [¶] . . . [¶] . . . [a]ffidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation . . . ."

[9] The record does not disclose when the IAB's citizen complaint procedure was established. However, we note that the original 1973 PRC ordinance would have prohibited the Berkeley Police Department from conducting its own internal investigations of complaints made against its employees. (*Brown, supra,* 57 Cal.App.3d at pp. 228–229.) The Court of Appeal in its 1976 *Brown* decision observed that this preemptive language in the PRC ordinance had been invalidated by the trial court, and it affirmed that portion of the judgment on appeal. (*Brown, supra,* at pp. 228, 237.)

Board of Inquiry findings."[10] At the same time, nothing prevents the police chief or the city manager from initiating an investigation or taking disciplinary action against an officer based in whole or in part on PRC findings. PRC findings, by law, are furnished to the police chief and city manager and Berkeley concedes that, like any other public record, such findings *could* be used to initiate disciplinary action.

### 3. *Cases Preceding* Copley Press

In *Bradshaw v. City of Los Angeles* (1990) 221 Cal.App.3d 908 [270 Cal.Rptr. 711] (*Bradshaw*), which was expressly disapproved by the Supreme Court in *Copley Press*, a Second Appellate District panel held that "Penal Code section 832.7, and the related legislation enacted with it, was intended to address the legal developments regarding discovery rights which followed the *Pitchess* decision and was not intended to abrogate a police department's right to disseminate [personnel-related] information . . ." pursuant to the California Public Records Act (Gov. Code, § 6250 et seq.) (Public Records Act). (*Bradshaw*, at p. 918.) As noted in *Bradshaw*, the Public Records Act gave police departments discretion to release information in an officer's personnel file when the public interest favored it. (*Bradshaw*, at p. 917.) The *Bradshaw* court also held that because section 832.7 only affected discovery rights in civil and criminal proceedings, it was not a limitation on the City of Los Angeles's right to hold public administrative hearings in officer disciplinary matters. (*Bradshaw*, at p. 921.)

A series of later appellate cases rejected *Bradshaw*'s reasoning and held that section 832.7 was not just a limitation on discovery in criminal and civil proceedings but it established a general condition of confidentiality for the records covered by it that applied regardless of the context in which those records are sought. (See *Davis v. City of San Diego* (2003) 106 Cal.App.4th 893, 901–902 [131 Cal.Rptr.2d 266] (*Davis*); *San Diego Police Officers Assn. v. City of San Diego Civil Service Com.* (2002) 104 Cal.App.4th 275, 281–288 [128 Cal.Rptr.2d 248] (*San Diego Police Officers Assn.*); *Rosales v. City of Los Angeles* (2000) 82 Cal.App.4th 419, 426 [98 Cal.Rptr.2d 144]; *City of Hemet v. Superior Court* (1995) 37 Cal.App.4th 1411, 1425–1430 [44 Cal.Rptr.2d 532]; *City of Richmond v. Superior Court* (1995) 32 Cal.App.4th 1430, 1439–1440 [38 Cal.Rptr.2d 632].)

Two of the foregoing cases are particularly noteworthy in light of the circumstances of this case. *San Diego Police Officers Assn.* involved the

---

[10] Under the City of Berkeley Charter, the city manager has sole authority over the discipline and discharge of all Berkeley employees. However, the Berkeley City Manager has delegated to the police chief the authority to issue disciplinary suspensions of fewer than three days and to issue written reprimands and letters of advice.

application of section 832.7 to appeal proceedings brought by peace officers employed by San Diego County and the City of San Diego after disciplinary action was taken against them by their employer. (*San Diego Police Officers Assn., supra*, 104 Cal.App.4th at pp. 277–278.) Although the plaintiffs in the case sought a determination that section 832.7 required disciplinary appeal hearings to be closed to the public, the appellate court declined on procedural grounds to decide that issue. (*San Diego Police Officers Assn.*, at pp. 287–288.) Nonetheless, because *San Diego Police Officers Assn.* held that confidential personnel records as defined by section 832.8 could not be disclosed at such appeal hearings if the affected officer objected (104 Cal.App.4th at p. 287), at least one of the agencies involved, the County of San Diego, adopted rules requiring that its civil service commission hearings be closed to the public if the affected officer requested it. (See San Diego County Civil Service Rules, § 15.1.6.) As discussed *post*, that rule change ultimately led to the Supreme Court's decision in *Copley Press* even though the high court did not in the end decide whether closed hearings were necessitated by section 832.7.

Also noteworthy is *Davis, supra*, 106 Cal.App.4th 893. In *Davis*, police officers and their association challenged the release by a San Diego citizen review board of a narrative report concerning a police shooting.[11] (*Davis*, at pp. 895–896.) In preparing the report, the board considered various documents developed in the course of an internal affairs investigation of the shooting by the police department. (*Id.* at pp. 896–897.) The Court of Appeal held that (1) the internal affairs documents relied upon by the citizen's review board were confidential records under sections 832.5, 832.7, and 832.8; and (2) because the citizen review board's report was based on information obtained from confidential records, the report itself was protected from public disclosure under section 832.7, subdivision (a). (*Davis*, at pp. 898–902.) *Davis* did not address or decide the issue of whether a citizen review board's investigation of a complaint against a police officer that is entirely *independent* of any internal affairs investigation falls under section 832.7.

### 4. *The* Copley Press *Decision*

*Copley Press* involved the issue of whether records of the County of San Diego Civil Service Commission relating to a police officer's administrative appeal of a disciplinary matter must be disclosed to a news agency under the Public Records Act when the commission had scheduled a closed hearing. (*Copley Press, supra*, 39 Cal.4th at p. 1279.) The Court of Appeal in that case had ordered the commission to disclose the requested records, including the name of the officer, redacted only to exclude certain documents in the

---

[11] The citizen review board reviews citizen complaints, police shootings resulting in death or injury, and in-custody deaths. (*Davis, supra*, 106 Cal.App.4th at p. 896.)

personnel file maintained by the officer's "employing agency," as that term is used in section 832.8, and oral testimony recited from those documents. (*Copley Press*, at p. 1279.) The appellate panel reasoned that section 832.7's confidentiality provision for "personnel records" as defined by section 832.8 contained the fundamental limitation that it only applied to files maintained by the officer's *employing agency* and did not apply to information, such as the testimony of percipient witnesses, that is developed from sources other than the individual's personnel file, even if that independently developed information duplicated information in the personnel file. (*Copley Press*, at pp. 1280–1281.)

■ Initially, the Supreme Court rejected Copley's argument, based on *Bradshaw*, that section 832.7 only applies to discovery in criminal or civil proceedings and had no application to an administrative appeal. The court disapproved *Bradshaw* on that point, and held that section 832.7 protected the confidentiality of documents and information covered by it regardless of the context in which they were being sought. (*Copley Press, supra*, 39 Cal.4th at pp. 1284–1286.)

The court next considered Copley's claim that the commission's records were not protected under section 832.7, subdivision (a), because they were neither "personnel records" nor "records maintained by any state or local agency pursuant to Section 832.5." (§ 832.7, subd. (a).) Copley argued in essence they were not "personnel records" under section 832.8, because the commission was not the officer's "employing agency," and they were not records maintained pursuant to section 832.5, because the commission was not "a department or agency . . . that employs peace officers" (§ 832.5, subd. (a)(1)).[12] (*Copley Press, supra*, 39 Cal.4th at pp. 1284, 1286–1296.)

The court rejected the first argument on two principal grounds. First, the court pointed out that the commission fulfills an essential statutory function under Government Code section 3304, which "prohibits a 'public agency' from taking 'punitive action . . . against any [nonprobationary] public safety officer . . . without providing the public safety officer with an opportunity for administrative appeal.' " (*Copley Press, supra*, 39 Cal.4th at p. 1287.) Under case law, the right of administrative appeal was a basic right that must be provided to public safety officers *by the public agencies that employ them*. (*Ibid.*) From this, the court concluded that it was reasonable to treat the

---

[12] The record did not disclose whether the underlying disciplinary action arose from a complaint filed by a member of the public, thus potentially coming within the confidentiality protection for " 'records maintained by any state or local agency pursuant to [s]ection 832.5.' " (*Copley Press, supra*, 39 Cal.4th at p. 1290 & fn. 11.) However, since Copley claimed that the documents were not entitled to protection from disclosure under either prong of section 832.7, the court addressed Copley's arguments under section 832.5, as well as section 832.8. (*Copley Press*, at pp. 1290–1294.)

commission as part of the appealing officer's "employing agency" for purposes of the confidentiality statutes "[b]ecause the Commission, a department of the County, has been designated to provide the appeal that the officer's employer is required by law to provide in connection with taking punitive action, it is reasonable to conclude that for purposes of applying the relevant statutes . . . , the Commission is functioning as part of 'the employing agency' and that any file it maintains regarding a peace officer's disciplinary appeal constitutes a file 'maintained . . . by [the officer's] employing agency' within the meaning of section 832.8." (*Id.* at p. 1288.) The court also noted that Copley's interpretation would impair this basic right of appeal by creating a strong disincentive to exercising it for officers who work in jurisdictions where disciplinary appeals are heard outside of the law enforcement department. (*Id.* at p. 1296.)

Second, although the term "employing agency" in section 832.8 is not defined, the court found that the term could reasonably be construed under settled principles of statutory construction to carry the same meaning that it does in the context of section 832.5, subdivision (c). The latter subdivision provides that complaints "determined by the peace . . . officer's employing agency" to be unfounded "shall not be maintained in that officer's general personnel file." (*Ibid.*) The court reasoned that this language would not carry out the Legislature's stated intention of ensuring that officers were not penalized by false complaints languishing in their personnel files unless it included the purging of complaints determined *by the agency hearing the officer's administrative appeal* to be unfounded. (*Copley Press, supra,* 39 Cal.4th at p. 1288.) Since "employing agency" was reasonably construed to include that entity when used in section 832.5, subdivision (c), it must carry the same meaning in section 832.8. (*Copley Press,* at pp. 1288–1289.)

Regarding Copley's claim that the commission's records were not " 'records maintained by any state or local agency pursuant to [s]ection 832.5,' " the court first posited that its analysis of the "employing agency" language of section 832.8 equally supported the conclusion that for purposes of section 832.5, the commission in hearing disciplinary appeals is functioning as part of a "department or agency that employs peace officers . . . ." (*Copley Press, supra,* 39 Cal.4th at p. 1290.) In addition, the court pointed out that section 832.5, subdivision (b) does not specify the entity that must maintain the records concerning complaints by members of the public against peace officers. (*Copley Press,* at pp. 1290–1291.) Further, section 832.5 does not specify the mechanisms local agencies must adopt for investigating citizen complaints as long as the complaints and records are kept confidential and maintained for five years. (*Copley Press,* at p. 1291.) In light of these considerations, and because the commission was a local agency designated to hear administrative appeals in citizen complaint cases, the court reasoned that

its records must be considered " 'records maintained by any state or local agency pursuant to Section 832.5.' " (*Ibid.*)

Although much of the court's foregoing analysis arguably depended on the fact that the commission (unlike the PRC in our case) was the agency designated to hear administrative appeals from officer disciplinary actions, the reasoning of *Copley Press* includes additional elements transcending that context in several respects.

First, in the course of criticizing and rejecting Copley's interpretation of the relevant statutes, the court expressed concern that Copley's narrow construction would not only deny confidentiality protection to records of an administrative appeal, but would deny such protection for "any part of a disciplinary matter handled outside the law enforcement department." (*Copley Press, supra*, 39 Cal.4th at p. 1294, fn. 16.)

Second, with the broader ramifications of Copley's position apparently in mind, the court expressed skepticism that in enacting the confidentiality statutes the Legislature intended to leave the extent of confidentiality available to a peace officer to depend on whether the jurisdiction in which the officer worked handled "all aspects of disciplinary matters and citizen complaints—including appeals," within the law enforcement department or assigned some responsibilities to an outside entity. (*Copley Press, supra*, 39 Cal.4th at p. 1294.) To this the court then added the following: "Of course, some jurisdictions may assign responsibility for *such matters* to persons outside the agency for reasons unrelated to—and without considering the implications for—public disclosure. Again, it is unlikely the Legislature, which went to great effort to ensure that records of such matters would be confidential and subject to disclosure under very limited circumstances, intended that such protection would be lost as an inadvertent or incidental consequence of a local agency's decision, for reasons unrelated to public disclosure, to designate someone outside the agency to hear *such matters.*" (*Id.* at pp. 1294–1295, italics added.)

Third, the court considered Copley's policy argument for narrowly construing the confidentiality statutes—based on the importance of fostering public confidence in law enforcement—and rejected it categorically as follows: "In enacting and amending sections 832.5, 832.7, and 832.8, the Legislature, though presented with arguments similar to Copley's, made the policy decision 'that the desirability of confidentiality in police personnel matters *does* outweigh the public interest in openness.' [Citation.] Copley fails to explain why the considerations underlying the Legislature's policy decision apply differently, depending on whether a part of a disciplinary matter that the officer's employer must, by statute, provide is handled inside or outside

the law enforcement department itself. In any event, it is for the Legislature to weigh the competing policy considerations." (*Copley Press, supra,* 39 Cal.4th at pp. 1298–1299, fn. omitted.)

Finally, although the court declined on procedural grounds to decide whether the public had a right to attend commission appeal hearings (*Copley Press, supra,* 39 Cal.4th at pp. 1281, fn. 3, 1304, fn. 27), it did decide a related matter that has an important practical impact on that issue. The court found that section 832.7, subdivision (a) not only protected the records pertaining to an officer's appeal from public disclosure, but also protected his or her identity from disclosure. (*Copley Press,* at pp. 1297–1298.) The court derived this conclusion from the language of section 832.7, subdivision (c), which states in relevant part: "Notwithstanding subdivision (a), a department or agency that employs peace or custodial officers may disseminate data regarding the number, type, or disposition of complaints . . . made against its officers if that information is in a form which does not identify the individuals involved." The court reasoned that the language of subdivision (c) shows that subdivision (a) was intended to protect, among other things, the identities of officers subject to complaints. (*Copley Press,* at p. 1297.) It found that the legislative history of the latter provision confirmed this interpretation. (*Ibid.*)[13]

With this factual and legal framework in mind, we now turn to the contentions of Berkeley and the American Civil Liberties Union (ACLU).[14]

## II.  DISCUSSION

A.  *Applicability of Sections 832.5, 832.7, and 832.8*

1.  *Berkeley's Contentions*

Berkeley contends that the confidentiality statutes were intended only to protect records that were subject to the already existing conditional privilege for "official information" under Evidence Code section 1040.[15] According

---

[13] In *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278 [64 Cal.Rptr.3d 661, 165 P.3d 462] (*CPOST*), the Supreme Court emphasized that sections 832.7 and 832.8 do not preclude the disclosure of the identities of peace officers per se. (*CPOST,* at p. 298.) They do bar "the identification of an individual as the officer involved in an incident that was the subject of a complaint or disciplinary investigation." (*Id.* at p. 299.)

[14] We granted the ACLU's application to file an amicus curiae brief on the applicability of section 832.7 and related statutes to Berkeley's PRC.

[15] Evidence Code section 1040 defines "official information" as "information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made." (*Id.,* § 1040, subd. (a).) Under section 1040, a public entity has a privilege to refuse to disclose official

to Berkeley, the Legislature's concern about confidentiality did not extend beyond the types of documents that the defense was seeking to discover in *Pitchess*. Those were documents generated by the administrative bureau of the sheriff's office in an investigation of citizen complaints against its officers, especially statements made by witnesses in confidence to the office's investigators that already qualified for protection as official records under section 1040. (See *Pitchess, supra*, 11 Cal.3d at pp. 537, 539.) Under Berkeley's analysis, the confidentiality statutes merely made the fact that these records were conditionally privileged explicit in Penal Code section 832.7, and created a special motion procedure for their release. Therefore, Berkeley would have us conclude that section 832.7 applies only to the records of a "confidential investigatory process . . . which can lead to discipline." Although the IAB's records would fall squarely into that category, the PRC's records would not because the PRC process from its inception has been public rather than confidential and assertedly cannot lead to discipline. In Berkeley's view, *Copley Press* merely confirms the "unremarkable" proposition that section 832.7 "applies to a local government commission only when it has a role in imposing discipline or hearing appeals in disciplinary matters."

We do not find Berkeley's narrow reading of either section 832.7 or the *Copley Press* decision very persuasive. First, nothing in the text of the statute or in the reasoning of *Copley Press* supports it. No cross-reference to Evidence Code section 1040 or the "official information" privilege can be found in Penal Code sections 832.5, 832.7, or 832.8. The *Copley Press* decision also does not mention or refer to the "official information" privilege. In fact, holding that the confidentiality of officer personnel records under section 832.7 must be based on the "official information" privilege would effectively eviscerate the statute as construed in *Copley Press*. An "official information" privilege exists, if at all, *only* if the public entity with the information subject to the claimed privilege has not disclosed it publicly and *only* if the entity chooses to assert the privilege when the information is sought. If section 832.7 only extended to records and information subject to the privilege, it would not cover any records or information that had historically been treated as accessible to the public by the agency holding them or as to which the agency declined to assert the "official information" privilege. Instead of protecting the confidentiality of information concerning citizen complaints against peace officers, it would be tantamount to leaving the confidentiality of such information to the discretion of each individual jurisdiction in the state. A

information (1) if disclosure is forbidden by law or (2) if the necessity for preserving the confidentiality of the information outweighs the necessity for disclosure in the interest of justice. (*Id.*, § 1040, subd. (b)(1), (2).)

state law construed in the manner Berkeley proposes would serve no function whatsoever in establishing a statewide standard.[16]

■  Second, the rationale of *Copley Press* cannot otherwise be limited just to appeals from internal affairs disciplinary investigations. As noted, the Supreme Court made its view clear in that case that the confidentiality statutes apply to the handling of "all aspects of disciplinary matters and citizen complaints," without regard to the mechanisms set up by a local jurisdiction to handle such matters, and without regard to whether entities independent of the jurisdiction's police department or agency play a role in investigating or hearing such matters. (*Copley Press, supra*, 39 Cal.4th at pp. 1294–1295.) Had the court intended to limit the precedential significance of *Copley Press* to disciplinary appeals only, it would have added limiting language to that effect to the opinion.

■  Third, it was not a controlling factor—either in *Pitchess* or in *Copley Press*—that the records concern a formal *disciplinary* proceeding against a peace officer. The documents in issue in *Pitchess* were not being sought by the defendant because they involved disciplinary proceedings against the deputies he was accused of attacking, but because they "involved accusations by . . . members of the public that the deputies . . . had themselves used excessive force on previous occasions." (*Pitchess, supra*, 11 Cal.3d at p. 534.) Similarly, section 832.7 does not make it a necessary condition for confidentiality to apply that the officer whose records are sought be involved in a disciplinary proceeding. It is sufficient that he or she be *the subject of a citizen complaint* without regard to whether disciplinary action is also involved.[17] In fact, as the Supreme Court stated in *CPOST, supra*, 42 Cal.4th at page 293, the Legislature's "major focus in adopting the [confidentiality statutes] was the type of record at issue in *Pitchess—records of citizen complaints against police officers*." (Italics added.)

■  The text of the statutes demonstrates that records pertaining to citizen complaints are protected regardless of whether they are associated with disciplinary proceedings against the subject officers. Thus, nothing in section 832.7 or 832.5 requires that "records maintained . . . pursuant to Section

---

[16] In fact, on Berkeley's theory it is difficult to see why *Copley Press* would not have come out the other way. As discussed earlier, until the decision in *San Diego Police Officers Assn.*, San Diego Civil Service Commission disciplinary appeal hearings for peace officers had been open to the public. No "official information" privilege could have been claimed as to documents or information disclosed during the course of such hearings because the public nature of the process would have been inconsistent with any such claim.

[17] As a practical matter, a citizen complaint against an officer will trigger a disciplinary proceeding in most jurisdictions, but the conjunction of the two is not required by the statute.

832.5" include only those generated or relied on in the course of a disciplinary investigation or proceeding. Section 832.5 merely requires the establishment of procedures to investigate "complaints by members of the public" against peace officers. (§ 832.5, subd. (a)(1).) It does not require that such procedures be part of or result in a disciplinary proceeding against the officer. Similarly, the term "personnel records" as defined in section 832.8, includes files containing records relating to "complaints . . . pertaining to the manner in which [the peace officer] performed his or her duties." (§ 832.8, subd. (e).) By its terms, section 832.8, subdivision (e) would apply without regard to whether such complaints were part of any disciplinary proceeding against the officer. In fact, if Berkeley's interpretation of the statute were correct, subdivision (e) would be entirely superfluous. Section 832.8, subdivision (d) already covers all documents relating to "[e]mployee . . . appraisal . . . or discipline." If personnel documents concerning complaints about officer performance had to be related to a disciplinary proceeding in order to be considered confidential, they would already be covered by subdivision (d) and there would be no need for subdivision (e). Berkeley's interpretation thus requires unexpressed limitations to be read into the statute while rendering other parts of it superfluous.

Even assuming for the sake of analysis that some nexus to disciplinary action is required under section 832.5, we would still find the statute applicable to the PRC. PRC findings are, by law, automatically transmitted to the chief of police and city manager, the two city officials who exercise disciplinary authority over Berkeley police officers. Berkeley concedes that adverse PRC findings can theoretically be used as a basis for taking disciplinary action against an officer, although it strenuously denies that this has ever happened in practice. We think this possibility would by itself be sufficient to make section 832.5 applicable if, notwithstanding the express language of the statute, the Legislature intended confidentiality to attach only to investigations that can lead to disciplinary action.

It is also immaterial that Berkeley has created two parallel procedures for investigating citizen complaints, one conducted by the PRC and the other by the IAB. As long as both procedures fit the description of section 832.5, there is no reason why sections 832.5 and 832.7 should not apply equally to both.

Fourth, we find no support for Berkeley's position in the two post-*Copley Press* cases that it cites in its favor. In *CPOST*, a newspaper sought the release of information in a database collected by a state agency that sets minimum selection and training standards for peace officers. (*CPOST, supra*, 42 Cal.4th at pp. 285–286.) The database—which included employment data on all peace officers appointed in California starting in the 1970's—was compiled from information provided by local law enforcement agencies that

they had obtained from the officers' personnel records. (*Id.* at p. 286.) The court held that otherwise nonconfidential information—a peace officer's name, employing agency, and employment dates—does not become confidential for purposes of sections 832.7 and 832.8 merely because it is derived from a personnel file that *also* contains confidential information. (*CPOST*, at pp. 289–293.) As noted earlier, the court in *CPOST* sharply distinguished its holding in *Copley Press* that the confidentiality statutes do protect peace officers from the public disclosure of records and information concerning citizen complaints against them. (*CPOST*, at pp. 298–299.) While the court's opinion in *CPOST* echoes some of Berkeley's policy arguments about the importance of openness and public accountability in law enforcement, the court recognized that its role required it to assume, as we must, that in enacting the confidentiality statutes the Legislature "drew the line carefully, with due concern for the competing interests." (*Id.* at p. 298.)

The court's companion decision to *CPOST, International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319 [64 Cal.Rptr.3d 693, 165 P.3d 488] (*Local 21*), involved a newspaper's Public Records Act request for the names, job titles, and salaries of city employees earning $100,000 or more, including peace officers. (42 Cal.4th at p. 327.) The court held that sections 832.7 and 832.8 did not exempt peace officer name and salary information from disclosure. (*Local 21*, at p. 346.) This was based on a very straightforward textual interpretation of the phrase "personnel records" in section 832.8. Since the statute neither expressly mentions salary information as a protected category nor contains any other text from which to protect such information could reasonably be implied, records containing such information may not be deemed to be "personnel records" entitled to protection under the statute. (*Local 21*, at pp. 340–346.) In contrast, sections 832.5 and 832.8 *do* expressly reference records concerning citizen complaints. Thus, it is difficult to understand how *Local 21* advances Berkeley's argument that the PRC's records concerning citizen complaints fall outside the reach of the statutes.

Fifth, Berkeley's "home rule" arguments do not dictate a contrary result. There is no genuine conflict between Berkeley's PRC ordinance and the state confidentiality statutes. Nothing in the PRC ordinance requires that board of inquiry proceedings be open to the public.[18] Board proceedings have been opened to the public solely by administrative regulation. Even under the

---

[18] Berkeley Municipal Code section 3.32.010 states that the general purpose of the PRC ordinance is "to provide for community participation in setting and reviewing Police Department policies, practices and procedures and to provide a means for prompt, impartial and fair investigation of complaints brought against the Berkeley Police Department." Thus, the stated purposes of the ordinance require "community participation" only in the PRC's policy advisory role, not in its function of providing for prompt, impartial, and fair investigations of complaints against individual officers.

regulations, the board of inquiry can decide by unanimous vote to close the hearing to protect the rights and privacy of individuals. In any event, the issue of whether section 832.7 supersedes local laws creating citizen police review boards was addressed by the California Supreme Court in *Dibb v. County of San Diego* (1994) 8 Cal.4th 1200 [36 Cal.Rptr.2d 55, 884 P.2d 1003]. The taxpayer-plaintiff in that case sought to enjoin a charter county, San Diego County, from spending money to establish a citizens' law enforcement review board. The plaintiff claimed, among other things, that the new board's subpoena power conflicted with section 832.7, but the court summarily rejected this claim: "[P]laintiff suggests the [citizens law enforcement review board's] subpoena power conflicts with general law because the board might issue subpoenas that seek information made confidential by Penal Code section 832.7, which imposes on the sheriff the duty to maintain the confidentiality of peace officer personnel records or information obtained from those records. No such conflict exists. The charter amendment does not (and may not) supersede general law governing privileges or confidentiality of records . . . ." (*Dibb v. County of San Diego,* at p. 1210, fn. 5.)

Finally, because the *San Diego Police Officers Assn.* and *Copley Press* cases did not reach the issue of whether section 832.7 bars public hearings on citizen complaints against officers, we emphasize that we see no basis for treating PRC board of inquiry hearings differently than PRC records. As a practical matter, the holding of a public hearing on a complaint against a peace officer would run afoul of *Copley Press* by publicly disclosing the identity of the officer who is the subject of the complaint. (*Copley Press, supra,* 39 Cal.4th at pp. 1297–1298.) In addition, a public hearing would necessarily result in the disclosure of information obtained from records contained in the PRC's investigative files, including the recorded or transcribed statements given by the complainant, witnesses, and officer, any memoranda prepared by PRC investigators, and the contents of the complaint itself. Parties and witnesses could not be effectively cross-examined or questioned by board of inquiry members without disclosing information contained in those records.[19]

■   Thus, we conclude that the records and findings of the PRC are protected from disclosure under section 832.7, subdivision (a), both as "records maintained by any state or local agency pursuant to Section 832.5" and as "personnel records." The records fall into the former category because the PRC is a governmental agency in this state that investigates complaints

---

[19] The PRC regulations state: "Members of the Board [of Inquiry] shall be primarily responsible for obtaining testimony. The Investigator will answer Commissioner's questions on the evidence, points of law, and procedure." (Berkeley PRC Regs. (2007) § III.16.f.) As noted earlier, all board members are given a copy of the investigative memorandum prepared by the PRC investigator, which includes transcripts of all relevant interviews.

by members of the public against peace officers. The PRC's records fall into the latter category because they relate to complaints or investigations of complaints pertaining to the manner in which Berkeley police officers perform their duties. (See § 832.8, subd. (e).)[20,21] Public hearings on citizen complaints by PRC boards of inquiry would necessarily violate section 832.7, subdivision (a) by disclosing information "obtained from" confidential records, including the identity of officers who are subject to complaints and the content of investigative files and memoranda compiled by PRC investigators before the hearing.

### 2. The ACLU's Contentions

The ACLU develops a statutory argument, similar to the argument made by the San Diego Civil Service Commission in *Copley Press*, to the effect that sections 832.5 and 832.8 only protect records pertaining to internal investigations conducted by police departments. Since the PRC (1) operates independently of the Berkeley Police Department; (2) was not created to comply with section 832.5, subdivision (a); and (3) does not function as the entity designated to hear appeals from Berkeley Police Department disciplinary decisions, the ACLU contends that the PRC's records are not confidential under those statutes. As construed in *Copley Press* and *CPOST*, however, the statutes in issue were aimed primarily at protecting the confidentiality of records pertaining to citizen complaints against police officers, and the Legislature did not intend to allow local jurisdictions to circumvent that protection either deliberately or inadvertently by the manner in which they assigned responsibility for the investigation of such complaints. (*Copley Press, supra*, 39 Cal.4th at pp. 1294–1295; *CPOST, supra*, 42 Cal.4th at p. 293.) Thus, the reason the PRC was originally established, the independence it has from the police department, and the fact that it does not impose or recommend disciplinary actions do not exempt its records from the coverage of those statutes.

The ACLU also offers a spirited policy argument in support of the openness and transparency of Berkeley's system for civilian oversight of

---

[20] We do not rule out other possible theories under which the records might be protected by sections 832.7 and 832.8.

[21] PRC findings and investigative materials concerning an officer are apparently never put into a file that is "maintained under that individual's name." (§ 832.8.) However, we agree with *Davis*, that section 832.8 should be construed to cover "any report [or other record] naming an individual officer and relating to a complaint or investigation of [a] complaint about an event the named officer participated in or perceived and that concerned the manner of the officer's performance of duty," regardless of the name or caption under which the report or record is kept. (*Davis, supra*, 106 Cal.App.4th at pp. 899–900.) Consistent with the analysis in *Copley Press*, the Legislature did not intend to give jurisdictions the discretion to disclose or protect confidential records concerning citizen complaints against peace officers based on the filing system under which such records were kept.

police. The ACLU argues that: "Dissemination of information [about citizen complaints] serves as a deterrent against misconduct and generates public confidence in the ability of government to hold police accountable when necessary. . . . [¶] . . . [¶] . . . Closing off the PRC process to the public will only serve to increase suspicion of the Police Department and generate mistrust by members of the community."

As an initial matter, we note that the PRC provides civilian oversight and public accountability for police conduct even if state law requires that its board of inquiry hearings be closed to the public. The PRC will still meet in public session to "set[] and review[] Police Department policies, practices and procedures." (Berkeley Mun. Code, § 3.32.010.) In its function of investigating citizen complaints against individual officers, the PRC will continue to represent the public and be independent of the police department because the board of inquiry members are civilian volunteers appointed to the commission by the city's most visible elected officials.

■ To the extent, however, that a closed PRC investigative process is less effective than an open one in accomplishing the objectives of civilian oversight, that is a matter that must be addressed to the Legislature. By its enactment of the statutes in question, the Legislature has weighed the competing interests involved and come down on the side of protecting the confidentiality of records and information gathered in the course of investigating citizen complaints against police officers. (*Copley Press, supra*, 39 Cal.4th at pp. 1298–1299; *CPOST, supra*, 42 Cal.4th at p. 298.) As the Supreme Court held in *Copley Press*, the Legislature intended such confidentiality to extend to all peace officers in the state regardless of how the jurisdictions employing them chose to organize and carry out such investigations. Our role is not to second-guess the Legislature's policy choices in that regard, but to apply the statutes in question as reflected in their text and construed by our Supreme Court.

### 3. Conclusion

The trial court properly held that Berkeley must comply with section 832.7 and not disclose peace officer personnel records except in accordance with the contingencies specified in that section and must cease permitting the public to access PRC investigations, reports, hearings, and findings.[22]

### B. Applicability of PBRA

■ Section 3303 of the PBRA describes in detail the conditions that must be followed "[w]hen any public safety officer is under investigation and

---

[22] The officer who is the subject of a PRC proceeding may, of course, choose to waive the confidentiality protection of section 832.7.

*subjected to interrogation by his or her commanding officer*, or any other member of the employing public safety department, *that could lead to punitive action . . . .*" (Gov. Code, § 3303, italics added; see *California Correctional Peace Officers Assn. v. State of California* (2000) 82 Cal.App.4th 294, 304–305 [98 Cal.Rptr.2d 302] (*CCPOA*).)[23] Berkeley contends the trial court erred in holding that PRC procedures were subject to Government Code section 3303.

Berkeley argues that the PBRA does not apply to PRC proceedings because the PRC is an independent commission that operates outside of the Berkeley Police Department, does not answer to the police chief or city manager, and does not have the power to initiate or even recommend disciplinary actions against police officers. According to Berkeley, the PRC staff and commissioners can therefore not be considered to be either the interrogated police officer's "commanding officer" or "member[s] of [his] employing public safety department." (Gov. Code, § 3303.) Further, because there is no evidence in the record that any Berkeley police officer has ever been disciplined based on PRC findings, Berkeley maintains that PRC proceedings, unlike

---

[23] Government Code section 3303 specifies, in relevant part, the following conditions of interrogation: "(a) The interrogation shall be conducted at a reasonable hour . . . . If the interrogation does occur during off-duty time of the . . . officer being interrogated, the . . . officer shall be compensated for any off-duty time in accordance with regular department procedures . . . . [¶] (b) The . . . officer under investigation shall be informed prior to the interrogation of the rank, name, and command of the officer in charge of the interrogation, the interrogating officers, and all other persons to be present during the interrogation. All questions . . . shall be asked by . . . no more than two interrogators at one time. [¶] (c) The . . . officer under investigation shall be informed of the nature of the investigation prior to any interrogation. [¶] (d) The interrogating session shall be for a reasonable period taking into consideration gravity and complexity of the issue being investigated. . . . [¶] (e) The . . . officer under interrogation shall not be subjected to offensive language or threatened with punitive action, except that an officer refusing to respond to questions or submit to interrogations shall be informed that failure to answer questions directly related to the investigation or interrogation may result in punitive action. No promise of reward shall be made as an inducement to answering any question. The employer shall not cause the . . . officer under interrogation to be subjected to visits by the press or news media without his or her express consent nor shall his or her home address or photograph be given to the press or news media without his or her express consent. [¶] (f) No statement made during interrogation by a[n] . . . officer under duress, coercion, or threat of punitive action shall be admissible in any subsequent civil proceeding [with specified exceptions that are not material here]. . . . [¶] . . . [¶] (g) The complete interrogation of a public safety officer may be recorded. If a tape recording is made . . . , the . . . officer shall have access to the tape . . . . The . . . officer . . . shall have the right to bring his or her own recording device and record any and all aspects of the interrogation. [¶] (h) If prior to or during the interrogation . . . it is deemed that [the officer] may be charged with a criminal offense, he or she shall be immediately informed of his or her constitutional rights. [¶] (i) Upon the filing of a formal written statement of charges, or whenever an interrogation focuses on matters that are likely to result in punitive action against any public safety officer, that officer . . . shall have the right to be represented by a representative of his or her choice who may be present at all times during the interrogation. . . ."

IAB investigations, do not "lead to punitive action." (*Ibid.*) On the other hand, there is no dispute that copies of the PRC's written findings after a board of inquiry hearing must be sent to the police chief and city manager. Berkeley concedes that these officials may use the findings to initiate disciplinary action, just as they may use any other public document such as a police report or newspaper article.

In rejecting Berkeley's position, the trial court relied in part on *CCPOA*. *CCPOA* held that state prison guards were entitled to the protection of Government Code section 3303 when they were interrogated by Department of Justice (DOJ) investigators in connection with alleged criminal activity at Corcoran State Prison: "Plaintiff officers argue section 3303 should be applied in this case notwithstanding the fact that the DOJ, which conducted the interrogations, was not their employer, because 'the State created a scheme in which both [the California Department of Corrections (CDC)] and DOJ were inextricably intertwined, each acting as agents of the other.' . . . [¶] We agree that, in this situation, the DOJ's involvement does not serve to immunize the CDC from the provisions of section 3303." (*CCPOA, supra*, 82 Cal.App.4th at pp. 306–307, fn. omitted.)

Several facts are salient here. The PRC and its staff have no authority to order a police department employee to provide a statement in a PRC investigation. The PRC notifies the chief of police that it would like to interview a particular officer and the chief of police issues a written order to the officer to attend the PRC interview. The order states in relevant part: "You are . . . advised that if you refuse to answer questions relating to the performance of your official duties, you will be subject to departmental charges which could result in discipline or your dismissal from the Berkeley Police Department." Any officer who fails to appear is violating a direct order and is subject to disciplinary action up to and including termination. The PRC does in fact provide the accused officer with all of the protections of the PBRA during the prehearing investigation, even though it insists it is not legally required to do so.

While the specific facts regarding the involvement of the officers' employing agency here are different from those in *CCPOA*,[24] we find that the

---

[24] "The CDC did not merely order the correctional officers to cooperate with the DOJ investigation, but delivered interviewees to DOJ investigators, and threatened them with arrest and/or discipline if they asserted their rights during interrogation by DOJ agents. Until they had given statements, correctional officers were prevented from leaving prison grounds by their employer. Hallway exits and interrogation rooms were guarded by the CDC. The interviews took place during work hours or immediately thereafter, on work premises. Upon being told by DOJ interrogators that an officer was not providing satisfactory responses during the interrogation, CDC employees threatened the officers with criminal and disciplinary sanctions." (*CCPOA, supra*, 82 Cal.App.4th at p. 307.)

underlying rationale of the *CCPOA* decision applies with equal force in this case. In our view, the fundamental reason for treating the DOJ's interrogation of the prison guards in *CCPOA* as an interrogation by their employer, the CDC, was that the DOJ in fact depended on the CDC's coercive power as the guards' employer to compel the guards to submit to its interrogation. Although the CDC used a range of coercive techniques, including forcing the guards into the interrogation rooms and threatening them with arrest, its threat to take disciplinary action against the guards that could severely damage, if not end, their law enforcement careers had to be among the most effective. Under that type of threat, most public safety officers would submit to interrogation even if no other physical restraint or threat was applied. In that respect, we see no material distinction between the roles the Berkeley Police Chief and City Manager play in securing police officer cooperation with PRC investigations and the role of the CDC in securing cooperation with the DOJ investigation in *CCPOA*. In both cases, the employing agency effectively delivers the officers for interrogation to another agency and prevents them from refusing to answer questions under threat of losing their jobs and placing their law enforcement careers in jeopardy. By directing officers to submit to interrogation in a process that can lead to disciplinary action against them, Berkeley's city manager and police chief are effectively participating in the PRC investigative and hearing process. Although the facts of *CCPOA* are distinguishable, the principle that it applied in finding Government Code section 3303 applicable is not.

Berkeley relies on the following dicta in a footnote to the *CCPOA* opinion: "It must be acknowledged that an independent investigation will usually require some cooperation by the employing agency. *For example, as plaintiffs in this case conceded, a request that an outside agency investigate an employee, and an order to the employee to show up at that agency's offices to be interviewed under threat of insubordination charges for failure to comply does not subject the employer to the constraints of the Act.* ([Gov. Code,] § 3304, subd. (a).)" (*CCPOA, supra,* 82 Cal.App.4th at p. 312, fn. 8, italics added.) To the extent that this dicta could be read as applying outside of the context of *criminal* investigations, we do not agree with it. The statutory provision the court cited as the authority for its comment, section 3304, subdivision (a), by its terms does not apply to administrative investigations and hearings such as those conducted by the PRC nor, in our view, does it pertain in any obvious way to the construction of section 3303.

■ Government Code section 3304, subdivision (a) states: "No public safety officer shall be subjected to punitive action, or denied promotion, or be threatened with any such treatment, because of the lawful exercise of the rights granted under this chapter, or the exercise of any rights under any existing administrative grievance procedure. [¶] *Nothing in this section shall*

*preclude a head of an agency from ordering a public safety officer to cooperate with other agencies involved in criminal investigations. If an officer fails to comply with such an order, the agency may officially charge him or her with insubordination."* (Italics added.) In our view, the italicized language merely qualifies the sentence that precedes it, specifying that the sentence should not be construed to prevent agencies employing police officers from compelling those officers to cooperate with criminal investigations by other agencies. It does not purport to control or limit the circumstances under which section 3303 will be deemed to apply when a city uses its disciplinary powers over officers to compel them to cooperate in an administrative investigation by another arm of the city government.

■ We hold that when officers are made to appear for interrogation or a factfinding hearing by order of their employer and under penalty of disciplinary sanction up to and including dismissal for failing to comply, this is tantamount to being subjected to interrogation by the officer's "commanding officer, or [another] member of the employing public safety department." (Gov. Code, § 3303.) The second requirement for section 3303 to apply—that the police chief or city manager can take disciplinary authority against an officer based on PRC findings—is also satisfied in this case. The statute applies to investigations that "could lead to punitive action." (§ 3303.) Berkeley has admitted that the police chief or city manager can take disciplinary action against an officer based in whole or in part on PRC findings. No more than that is required.

We reject Berkeley's assertion that writ relief should not have issued because, although not required to do so, it is already affording officers the rights specified in Government Code section 3300 et seq. We agree with the trial court that the undisputed facts showed a mandatory duty on Berkeley's part to apply the PBRA to PRC proceedings and a clear and beneficial right to the performance of that duty by the BPA. That satisfied the requirements for writ relief to issue. (*Loder v. Municipal Court* (1976) 17 Cal.3d 859, 863 [132 Cal.Rptr. 464, 553 P.2d 624].) Berkeley's qualified compliance with the PBRA during the prehearing investigative phase, while reserving the right to depart from it at will without consequences, does not discharge its ministerial duty under the statute.

In our view, the trial court was therefore correct in holding that Government Code section 3303 applied to PRC proceedings and in ordering Berkeley to comply with it.

## III.   DISPOSITION

The order granting BPA's motion for peremptory writ of mandate is affirmed.

Marchiano, P. J., and Swager, J., concurred.