Filed 5/30/18; pub. order 6/22/18 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RAIN O. DAUGHERTY et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO et al., <br><br> Defendants and Appellants. | A145863, A147385 <br><br> (City & County of San Francisco Super. Ct. No. CPF-15-514302) |

Under the Public Safety Officers Procedural Bill of Rights Act (POBRA) (Gov. Code, § 3300 et seq.),[1] no punitive action may be taken against a public safety officer for any alleged act, omission, or other misconduct unless the investigation is completed within one year of "the public agency's discovery by a person authorized to initiate an investigation of the allegation of an act, omission, or other misconduct," subject to certain statutory exceptions. (§ 3304, subd. (d)(1).) One such exception provides that the one-year time period is tolled while the act, omission, or other alleged misconduct is also the "subject" of a pending criminal investigation or prosecution. (*Id*., subd. (d)(2)(A).)

This case arises out of a criminal corruption investigation of officers in the San Francisco Police Department (SFPD). The investigation began in 2011 and was led by the United States Attorney's Office (USAO), with the assistance of select members of the

_____

[1] Unless otherwise noted, all further statutory references are to the Government Code.

1

criminal unit of SFPD's Internal Affairs Division (IAD-Crim). During the course of the investigation, search warrants of the cellphone records of former SFPD Sergeant Ian Furminger—the central figure in the corruption scheme—led to the discovery in about December 2012 of racist, sexist, homophobic, and anti-Semitic text messages between Furminger and nine SFPD officers.[2]

The criminal case proceeded to trial and resulted in a verdict against Furminger and a codefendant for conspiracy to commit theft, conspiracy against civil rights and wire fraud. Three days after the verdict, on December 8, 2014, the text messages were released by the USAO to the administrative unit of SFPD's Internal Affairs Division (IAD-Admin). After IAD-Admin completed its investigation of the text messages, the chief of police issued disciplinary charges against respondents in April 2015.

While the disciplinary proceedings were pending, respondent Rain O. Daugherty went to court and filed a petition for writ of mandate and complaint for extraordinary relief, seeking to rescind the disciplinary charges on the grounds that they were untimely. The remaining respondents joined in Daugherty's petition. The trial court granted the writ petition and complaint, finding the one-year statute of limitations began to accrue in December 2012 when the misconduct was discovered, and thus, the investigation of respondents' misconduct was not completed in a timely manner.

For the reasons discussed below, we conclude the one-year statute of limitations did not begin to run until the text messages were released by the USAO to IAD-Admin, because before then, the alleged misconduct was not and could not be discovered by the "person[s] authorized to initiate an investigation" for purposes of section 3304, subdivision (d)(1). We alternatively conclude the one-year statute of limitations was tolled until the verdict in the criminal corruption case because the text messages were the "subject" of the criminal investigation within the meaning of section 3304, subdivision

---

[2] These officers are Rain O. Daugherty and eight others who were permitted to proceed in this case anonymously under their disciplinary matter numbers: 2015-0036, 2015-0076, 2015-0078, 2015-0079, 2015-0082, 2015-0083, 2015-0084, and 2015-0087 (collectively respondents).

(d)(2)(A). Thus, the April 2015 notices of discipline were timely. Because the trial court's contrary conclusions were based on errors of law or were not supported by substantial evidence, we reverse.

## BACKGROUND

In 2011, San Francisco Public Defender Jeffrey Adachi accused SFPD officers in the "plainclothes" units at Mission and Southern Stations of conducting illegal searches of residential units in hotels, stealing the residents' property, and falsifying police reports regarding the legality of the searches. In response to these accusations, IAD-Crim opened criminal investigations into the alleged conduct.

SFPD's Internal Affairs Division is separated into two fully autonomous units: IAD-Crim and IAD-Admin. Each unit is supervised by a separately assigned police lieutenant. From February 2011 to June 2013, the supervising lieutenant of IAD-Crim was Lieutenant Jerome DeFilippo. He was succeeded by Lieutenant Michelle Jean, who supervised IAD-Crim from June 2013 to June 2015. At all relevant times, the supervising lieutenant of IAD-Admin was Robert Yick. Both the IAD-Crim and the IAD-Admin lieutenants report to the captain of the Risk Management Office (Risk Management), who reports to the deputy chief. The deputy chief oversees the day-to-day operations of the Office of the Chief of Staff and serves as the link between the chief of police and various units throughout SFPD. Investigations into potential criminal conduct by SFPD officers are handled by IAD-Crim, while disciplinary investigations are the purview of IAD-Admin. Where it is necessary to preserve confidentiality or protect the integrity of an ongoing criminal investigation, SFPD imposes a "wall" between IAD-Crim and IAD-Admin, preventing any dissemination of criminal evidence to the disciplinary investigators, or to the remainder of SFPD.

The USAO initiated its own criminal investigation of the plainclothes officers at Mission and Southern Stations, led by Assistant United States Attorney (AUSA) Andrew Caputo. In June 2011, the USAO and FBI called a meeting with select members of SFPD. In attendance at the June 14, 2011 meeting were AUSA Caputo; special agents from the FBI; SFPD Deputy Chief of Staff Lyn Tomioka; Risk Management Captain

3

Greg McEachern; and members of IAD-Crim, including Lieutenant DeFilippo, Inspector Darcy Keller, Sergeant Joseph Minner, and Officer Al Duarte. No officers assigned to IAD-Admin were present at this meeting.

One topic discussed at the June 2011 meeting was whether the federal authorities and SFPD should conduct parallel criminal investigations or a single investigation into the conduct of the officers at Mission Station. Deputy Chief Tomioka agreed, on behalf of Chief of Police Gregory Suhr and SFPD, that the USAO would lead a single investigation into Mission Station plainclothes officers assisted by select members of IAD-Crim. Deputy Chief Tomioka also agreed, as requested by the USAO, that IAD-Crim officers would maintain confidentiality throughout the Mission investigation. Deputy Chief Tomioka instructed the members of IAD-Crim who were present at the meeting to comply with the USAO's instructions. The USAO also required SFPD to identify the highest ranking person who would be privy to information regarding the investigation and to ensure that this designated person—the "firewall" or "gatekeeper"— would not disclose information about the case to anyone above his or her rank or to anyone outside the group of investigators working on the case. Deputy Chief Tomioka selected Lieutenant DeFilippo for this role. Under Lieutenant DeFilippo's direction, a select number of IAD-Crim members were assigned to work on the USAO's Mission investigation and were not permitted to disclose information about the investigation to anyone outside of the authorized group. AUSA Caputo also required all agents, IAD-Crim officers and anyone working on the Mission investigation to sign a nondisclosure agreement, known as a "6(e) agreement,"[3] before they could become privy to the federal government's grand jury evidence.

---

[3] A "6(e) agreement" or "Rule 6(e) letter" derives its name from rule 6(e) of the Federal Rules of Criminal Procedure (18 U.S.C.), which includes a prohibition on disclosure of grand jury matters by persons to whom disclosure was made, including government personnel considered by an attorney for the government as necessary to assist in performing that attorney's duty to enforce federal criminal law. (Fed. Rules Crim.Proc., rule 6(e)(2)(B)(vii) & (e)(3)(A)(iii), 18 U.S.C.)

Lieutenant Jean took over command of IAD-Crim in June 2013, and she was briefed on the USAO's information-sharing restrictions. Lieutenant Jean indicated, at the time of the briefing, that she understood she "was the last line of defense, so to speak, the wall between [IAD-Crim] and the department" and was not "at liberty to speak about anything regarding the ongoing criminal investigation."

At all times during the USAO's Mission Station corruption investigation and prosecution, the federal authorities retained exclusive authority to direct the course of the investigation and make the decisions about what criminal charges to pursue and against whom. Furthermore, all evidentiary materials discovered during the course of the USAO's investigation, as well as materials obtained or possessed by IAD-Crim during the investigation, belonged to the federal authorities.

**Discovery of the Text Messaging Misconduct**

Federal agents and IAD-Crim officers assigned to the criminal corruption investigation pursued dozens of leads, including reports that police officers had paid informants for information with stolen cars and attempted to sell drugs. Further investigation of the allegations of a confidential informant revealed that Furminger was at the center of a network of corrupt and criminal activities, and the investigators began focusing on his associates and contacts.

In December 2011, federal investigators obtained a search warrant for data from Furminger's cellphone. In August 2012 and November 2012, federal investigators obtained additional search warrants for text messages sent to or from Furminger's phone. The search warrants yielded thousands of Furminger's text messages from June 2011 to August 2012, including the text messages between Furminger and respondents. When Sergeant Minner and others in IAD-Crim discovered the offensive text messages, they brought them to the attention of Lieutenant DeFilippo.[4] The text messages were then

---

[4] The precise dates when Sergeant Minner brought respondents' text messaging misconduct to the attention of Lieutenant DeFilippo are not clear from the record, but the pleadings appear to form the basis for the parties' focus on the December 2012 time frame.

reviewed by investigators at the FBI and personnel at IAD-Crim. The offensive content of the text messages, as well as the fact that the texts involved communications between officers (including respondents) and superior officers (including Furminger), denoted a comfort level between respondents and Furminger that led the investigators to suspect respondents were engaged in illegal activities with Furminger.

Lieutenant DeFilippo engaged in several conversations concerning the text messages with the FBI and USAO. According to Lieutenant DeFilippo, because the text messages were "a mechanism in the investigation . . . , [the FBI and USAO] didn't want any of the subjects to know we were looking at their text messages. [¶] So it was told to me, 'No, we're not telling anybody about text messages.' " Copies of the text messages were kept in binders in Lieutenant DeFilippo's office under lock and key.

**Indictments and Convictions**

On February 24 and 25, 2014, a federal grand jury returned indictments charging six individuals—Furminger, Edmond Robles, Reynaldo Vargas, Arshad Razzak, Richard Yick, and Raul Elias—in two separate federal criminal proceedings captioned *United States v. Furminger et al.*, No. 14-CR-00102-CRB (N.D. filed Feb. 24, 2014) (*Furminger*), and *United States v. Razzak et al.*, No. 14-CR-00103-RS (N.D. filed Feb. 25, 2014) (*Razzak*).[5] In early February 2014, AUSA Rodney Villazor was assigned responsibility for the prosecution and trial of the *Furminger* and *Razzak* cases. Villazor's responsibilities included the postindictment investigation of the criminal course of conduct charged in the indictments, and the investigation and prosecution of related additional counts that were charged in a superseding indictment issued in *Furminger* in October 2014. At the outset of his involvement in the case, AUSA Villazor instructed IAD-Crim members to maintain the confidentiality of information and evidence

---

[5] The counts against Furminger, Robles, and Vargas were: (1) conspiracy to distribute controlled substances, (2) distribution of marijuana and aiding and abetting in the distribution of marijuana, (3) conspiracy against civil rights, (4) conspiracy to commit theft concerning a federally funded program, (5) theft concerning a federally funded program and aiding and abetting in the theft, and (6) (against Furminger only) extortion under color of official right.

6

accumulated in the corruption investigation "up until the return of a verdict in the *Furminger* case."

The text messages were part of criminal discovery in the *Furminger* case and were subject to a protective order entered by the United States District Court for the Northern District of California. According to AUSA Villazor, there were specific discussions about whether the criminal defendants would agree to modify the protective order to permit sharing or disclosure of discovery materials with IAD-Admin for the purpose of pursuing administrative, civil or disciplinary claims. However, the criminal defendants would not agree to the proposed modification or to the disclosure of these discovery materials to IAD-Admin.

On December 5, 2014, a federal jury convicted Furminger and Robles of conspiracy to commit theft, conspiracy against civil rights and wire fraud. Three days later, a meeting was held between Lieutenant Yick and members of IAD-Admin, IAD-Crim, and AUSA's Villazor and John Hemann. At this meeting, the USAO lifted the confidentiality restriction and authorized IAD-Crim to release respondents' text messages to IAD-Admin. In the following days, IAD-Crim provided voluminous records to IAD-Admin, including a CD containing thousands of pages of text messages sent and received by Furminger. Lieutenant Yick assigned three investigators to review the records for evidence of administrative misconduct.

On January 20, 2015, the executive director of the San Francisco Office of Citizen Complaints (OCC)[6] wrote to SFPD indicating that it had reviewed some of Furminger's text messages and found racist and other highly offensive messages between Furminger and SFPD officers, including some of the respondents. The IAD-Admin investigators ceased their review of other evidence, began reviewing the text messages for content similar to that identified by the OCC, and conducted interviews with the officers.

---

[6] The OCC is now the Department of Police Accountability. (See S.F. Prop. G, adopted Nov. 8, 2016, adding S.F. Charter, § 4.136, and amending *id.*, § 4.127.)

7

**Disciplinary Proceedings**

On April 2, 2015, Chief of Police Gregory Suhr filed disciplinary charges with the San Francisco Police Commission against eight of the nine respondents. On April 22, 2015, Chief Suhr noticed proposed discipline against the remaining respondent.

During an initial case management conference with the Commission, Daugherty argued that the discipline charges against him were untimely under POBRA's one-year statute of limitations. The Commission set dates for briefing and a hearing on the statute of limitations issue.

**Trial Court Proceedings and Appeals**

While the Commission proceedings were pending, on May 11, 2015, Daugherty filed a verified petition for writ of mandate and stay application combined with a complaint for extraordinary relief and civil penalty in the San Francisco Superior Court. The petition asserted three causes of action for: (1) writ of mandate under Code of Civil Procedure section 1085; (2) extraordinary relief under section 3309.5, subdivision (d)(1); and (3) complaint for a civil penalty pursuant to section 3309.5, subdivision (e), claiming appellants maliciously violated respondents' rights by pursuing and/or imposing punitive action after one year from the date of appellants' discovery of the alleged misconduct in December 2012. The remaining eight respondents joined Daugherty's petition.

The trial court granted respondents' ex parte application for a temporary stay order and ordered appellants to halt the administrative proceedings, pending a further hearing. Appellants filed a motion to vacate the order staying administrative proceedings on the grounds that the trial court lacked jurisdiction to adjudicate the merits of the petition. On June 22, 2015, the trial court denied the motion, finding that it was able to render appropriate relief pursuant to section 3309.5. In addition, the court determined that the stay of proceedings would remain in effect pending a final adjudication of the writ. In a separate order issued that same day, the trial court granted, in part, respondents' motion for a protective order and/or to seal records protected by Penal Code section 832.7. In particular, the court ordered certain personnel records to be filed under seal and permitted

8

respondents to proceed anonymously in court filings. On July 8, 2015, the trial court issued an order setting a hearing and briefing schedule for final adjudication of the writ.

On July 29, 2015, appellants timely appealed from the trial court's June and July 2015 orders (case No. A145863). Appellants also filed two separate petitions for a writ of supersedeas, both of which we summarily denied.

Thereafter, on December 21, 2015, the trial court held oral argument on the merits of respondents' writ petition and complaint for extraordinary relief. After the matter was submitted, the trial court issued an order granting the petition for writ of mandamus and extraordinary relief. Pursuant to section 3304, subdivision (d), and SFPD's General Order 1.06, the trial court found that "Lieutenant DeFilippo had an obligation to initiate an administrative investigation of [respondents'] misconduct in December 2012, when he first learned of the misconduct." The trial court further determined that SFPD's "unwritten policy, that the IAD-Admin Division is solely responsible for conducting administrative investigations of police misconduct, did not excuse the department's failure to conduct the investigation in a timely manner." Additionally, the trial court held that tolling under section 3304, subdivision (d)(2)(A), did not apply because "[respondents], their conduct, and their text messages were not the subject of a criminal investigation."

The court's order continued, "Even assuming in arguendo [*sic*] that the department was prevented from conducting an administrative investigation of [respondents'] misconduct during the criminal investigation of Mr. Furminger, . . . [appellants], however, have failed to demonstrate that an investigation of the misconduct was prohibited, for confidentiality purposes, after Mr. Furminger was indicted on February 25, 2014." Finally, the trial court held that appellants failed to establish the applicability of the statutory extensions for multijurisdictional and multi-officer investigations in section 3304, subdivision (d)(2)(C) and (D).

After the trial court entered its December 2015 order, appellants filed a second and timely notice of appeal from that order (case No. A147385). Respondents filed a motion seeking to dismiss the second appeal on the grounds that the appeal was premature and

9

violated the "one final judgment rule." In particular, respondents argued that the trial court's failure to resolve appellants' third cause of action seeking a civil penalty under section 3309.5, subdivision (e), required dismissal of the appeal. On March 4, 2016, we denied the motion to dismiss, without prejudice to future consideration of the issue on the merits of the appeal, including whether the December 21, 2015 order is appealable under Code of Civil Procedure section 904.1, subdivision (a)(6), or whether the interests of justice require that the appeal be treated as a petition for writ of mandate.

On May 3, 2016, these appeals were consolidated for briefing, argument and decision.

## DISCUSSION

### I. Appealability

"An appealable judgment or order is essential to appellate jurisdiction, and the court, on its own motion, must dismiss an appeal from a nonappealable order." (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 645 (*Art Movers*).) The substance and effect of the order, not its form, determine whether or not it constitutes an appealable final judgment or order. (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 698 (*Griset*).) With these standards in mind, we turn to whether we have jurisdiction to resolve these appeals.

Appellants argue the three orders issued by the trial court on June 22, 2015, and July 7, 2015 (case No. A145863), are appealable orders granting injunctive relief. We conclude that the second June 22, 2015 order and July 7, 2015 scheduling order cannot, in substance and effect, be construed as granting or refusing to dissolve an injunction because these orders did not enjoin or command the performance of a particular act by any person, and we have no jurisdiction to review them. (See *PV Little Italy, LLC v. MetroWork Condominium Assn.* (2012) 210 Cal.App.4th 132, 142–143.) While the first June 22, 2015 order was an appealable order "refusing to . . . dissolve an injunction" (Code Civ. Proc., § 904.1, subd. (a)(6)), it was rendered moot by the December 21, 2015

10

order. (See *People v. Rath Packing Co.* (1978) 85 Cal.App.3d 308, 314.) Accordingly, we shall dismiss the appeal from these orders.[7]

Appellants argue the December 21, 2015 order is an appealable order granting a writ of mandamus. (See *Daggs v. Personnel Commission* (1969) 1 Cal.App.3d 925, 930.) Such orders remain subject to the one final judgment rule, which "prohibits review of intermediate rulings by appeal until final resolution of the case." (*Griset*, *supra*, 25 Cal.4th at p. 697.) The December 21, 2015 order was not a final judgment that completely disposed of all the causes of action between the parties, and the unadjudicated third cause of action under section 3309.5, subdivision (e), left a number of potential issues for future consideration. (See *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743.) For example, any future proceeding would require the resolution of issues such as whether respondents' POBRA rights were "maliciously violated," whether appellants intended to injure respondents, and whether respondents suffered actual damages from the denial of POBRA rights. (§ 3309.5, subd. (e).) Resolution of these issues is not, as appellants argue, simply determining an amount of damages for which entitlement to relief has already been established or enforcing the terms of the December 21, 2015 order. (See *Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 998; *Public Defenders' Organization v. County of Riverside* (2003) 106 Cal.App.4th 1403, 1409.)

Appellants alternatively argue that the December 21, 2015 order is appealable under Code of Civil Procedure section 904.1, subdivision (a)(6), as an order granting a permanent injunction. In *Daro v. Superior Court* (2007) 151 Cal.App.4th 1079 (*Daro*), another panel of this division held that the order appealed from—characterized by the parties and trial court as a "preliminary injunction"—was properly considered a

---

[7] A sealing order is appealable under the collateral order doctrine (*Mercury Interactive Corp. v. Klein* (2007) 158 Cal.App.4th 60, 76–77), but appellants raised no claim of error with regard to this portion of the second June 22, 2015 order. Thus, we treat appellants' appeal of the sealing order as abandoned. (See *Rich v. State Board of Optometry* (1965) 235 Cal.App.2d 591, 602–603.)

permanent injunction. (*Id.* at p. 1091, fn. 3.) Noting a split of authority on the appealability of permanent injunctions, the *Daro* court held that "even if there were a question about the order's appealability [citation], we would simply exercise our discretion to treat the appeal as a petition for writ of mandate and arrive at the same outcome [citation]." (*Ibid.*, citing *Guntert v. City of Stockton* (1974) 43 Cal.App.3d 203, 207–209 and *Art Movers*, *supra*, 3 Cal.App.4th at pp. 650–651).)

We likewise conclude the December 21, 2015 order is an appealable permanent injunction, but even assuming there is some question about the appealability of this order, we, in all events, exercise our discretion to treat the appeal as a petition for writ of mandate. (*Daro*, *supra*, 151 Cal.App.4th at p. 191, fn. 3; *Morehart*, *supra*, 7 Cal.4th at pp. 764–765.) In our view, judicial economy would not be served by deferring resolution of this appeal pending a determination of the remaining third cause of action, as the merits of the issues on appeal have been fully briefed by the parties as well as the amici curiae. Moreover, any further proceedings in the trial court on section 3309.5, subdivision (e), would be unlikely to improve upon the record or briefing now presented to us for resolving the issues presented. (See *Morehart*, *supra*, at p. 746.)

## II. Standard of Review

"On appeal [from an order granting mandamus relief], we are not bound by any legal interpretation made by . . . the trial court. Instead, we make an independent review of any questions of law necessary to the resolution of this matter on appeal. [Citations.] Statutory interpretation is a clear question of law for our determination anew on appeal. [Citations.]" (*Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077 (*Breslin*).)

"As to factual issues, 'we determine whether the record provides substantial evidence supporting the trial court's factual findings. [Citation.] Applying the substantial evidence test on appeal, we may not reweigh the evidence, but consider that evidence in the light most favorable to the trial court, indulging in every reasonable inference in favor of the trial court's findings and resolving all conflicts in its favor. [Citations.] The question on appeal is whether the evidence reveals substantial support—

12

contradicted or uncontradicted—for the trial court's conclusion that the weight of the evidence supports the commission's findings of fact. [Citation.] We uphold the trial court's findings unless they so lack evidentiary support that they are unreasonable. We may not uphold a finding based on inherently improbable evidence or evidence that is irrelevant to the issues before us. [Citation.]' [Citation.]" (*Richardson v. City and County of San Francisco Police Com.* (2013) 214 Cal.App.4th 671, 692 (*Richardson*).)

"Substantial" evidence means evidence " 'of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record. [Citation.] While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citation]." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 (*Kuhn*.)

### III. The Trial Court Had Initial Jurisdiction to Proceed on the Mandamus Petition

Appellants contend that because the Commission had not yet issued a reviewable decision, respondents' cases were unripe when the trial court asserted mandamus jurisdiction. Specifically, appellants argue that neither the initiation of a disciplinary investigation by the chief of police nor the Commission's consideration of a limitations defense, as occurred here, supports the trial court's exercise of mandamus jurisdiction. Appellants cite *Moore v. City of Los Angeles* (2007) 156 Cal.App.4th 373 (*Moore*) for the position that an officer may not make a perfunctory showing in an administrative hearing and thereafter obtain an unlimited trial de novo on expanded issues. Appellants contend this is precisely what respondents did by raising the statute of limitations issue initially in the Commission proceedings but then filing their mandamus petition in court before the Commission reached a decision.

13

Section 3309.5 was "specifically designed to allow an officer to pursue a remedy immediately in the courts for violation of [the rights set forth in POBRA] during the investigation and not be required to wait for judicial review after administrative consideration of those violations." (*Mounger v. Gates* (1987) 193 Cal.App.3d 1248, 1256 (*Mounger*).) Thus, section 3309.5 provides that "[t]he superior court shall have initial jurisdiction over any proceeding brought by any public safety officer against any public safety department for alleged violations of this chapter [POBRA]." (§ 3309.5, subd. (c).) A violation of "this chapter" (chapter 9.7 of division 4 of title 1 of the Government Code, spanning §§ 3300–3313) occurs when "any public safety department [denies or refuses] to any public safety officer the rights and protections guaranteed to him or her by this chapter." (§ 3309.5, subd. (a).) "[T]he import of 'initial' in section 3309.5 is to remove the defense of failure to exhaust administrative remedies in the event the employee elects to go to court with his claim of [a POBRA] violation." (*Alameida v. State Personnel Bd.* (2004) 120 Cal.App.4th 46, 54.)

At issue in this case is the right to speedy disciplinary proceedings under section 3304, subdivision (d)(1), which is found within chapter 9.7. Significantly, for our analysis, the statute gives trial courts initial jurisdiction over "alleged" violations of POBRA. (§ 3309.5, subd. (c).) Thus, we disagree with appellants' contention that the trial court lacked initial jurisdiction over this controversy alleging violation of section 3304, subdivision (d)(1). The cases relied upon by appellants are distinguishable. *Moore* involved appellate review of administrative mandamus proceedings under Code of Civil Procedure section 1094.5, which is limited to issues in the record at the administrative level. (*Moore*, *supra*, 156 Cal.App.4th at pp. 382–384.) Undercutting the argument appellants make here, the *Moore* court specifically noted that the officer "never sought to invoke the superior court's injunctive power to enforce his rights under [POBRA] pursuant to section 3309.5." (*Id.* at p. 385.) Respondents, however, did invoke the superior court's remedial powers under section 3309.5.

Appellants' reliance upon *Gales v. Superior Court* (1996) 47 Cal.App.4th 1596 (*Gales*) fares no better. They cite *Gales* for the position that the proper roadmap for

14

POBRA cases is for an officer to file for administrative mandamus after an administrative decision has been rendered, along with a concurrent section 3309.5 action. *Gales*, however, did not provide a roadmap for officers, such as respondents, who only allege a violation of their rights to speedy discipline under POBRA. Rather, *Gales* addressed "whether a police officer is entitled—after the public entity employer has issued its final decision—to file an action under section 3309.5" and concluded the officer must file an administrative mandamus petition pursuant to Code of Civil Procedure section 1094.5 and may file a concurrent section 3309.5 action. (*Gales*, *supra*, at pp. 1602–1603.) Respondents' allegations of POBRA violations, however, are matters they were entitled to pursue "immediately in the courts" without having "to wait for judicial review after administrative consideration of those violations." (*Mounger*, *supra*, 193 Cal.App.3d at p. 1256.)

Appellants also argue the trial court exceeded its mandamus powers by compelling the Commission to exercise its discretion in a particular manner to reach a particular result. (*California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 303.) Again, we disagree. The trial court found that appellants violated respondents' rights to speedy disciplinary proceedings under section 3304, subdivision (d)(1), and accordingly enjoined appellants from taking punitive action against respondents. These actions were expressly permitted under section 3309.5, subdivision (d)(1), which provides in relevant part, "In any case where the superior court finds that a public safety department has violated any of the provisions of this chapter, the court shall render appropriate injunctive or other extraordinary relief to remedy the violation and to prevent future violations of a like or similar nature, including, but not limited to, the granting of a . . . permanent injunction prohibiting the public safety department from taking any punitive action against the public safety officer."

For these reasons, we conclude the trial court's exercise of initial jurisdiction under section 3309.5, subdivision (c), was proper.

15

**IV.POBRA's One-year Statute of Limitations**

"Protection of peace officers from abusive or arbitrary treatment in their employment is the essence of [POBRA]." (*Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 577 (*Pasadena Police Officers Assn.*).) "The various procedural protections provided by POBRA 'balance the public interest in maintaining the efficiency and integrity of the police force with the police officer's interest in receiving fair treatment.' [Citations.]" (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 320, superseded by statute on other grounds as stated in *Squire v. County of Los Angeles* (2018) 22 Cal.App.5th 16, 23.)

" 'One such protection is to have a speedy adjudication of conduct that could result in discipline.' " (*Parra v. City and County of San Francisco* (2006) 144 Cal.App.4th 977, 988 (*Parra*).) Accordingly, "no punitive action, nor denial of promotion on grounds other than merit, shall be undertaken for any act, omission, or other allegation of misconduct if the investigation of the allegation is not completed within one year of the public agency's discovery by a person authorized to initiate an investigation of the allegation of an act, omission, or other misconduct," subject to certain statutory exceptions. (§ 3304, subd. (d)(1).) "In the event that the public agency determines that discipline may be taken, it shall complete its investigation and notify the public safety officer of its proposed discipline by a Letter of Intent or Notice of Adverse Action articulating the discipline that year, except as provided in [the tolling and extension provisions of] paragraph 2." (*Ibid.*)

*a. Section 3303 does not govern accrual of POBRA's statute of limitations.*

We first address appellants' contention that POBRA's statute of limitations did not apply to the corruption investigation because section 3303, subdivision (i), provides an exception for investigations "concerned solely and directly with alleged criminal activities." Appellants rely primarily on *Van Winkle v. County of Ventura* (2007) 158 Cal.App.4th 492 (*Van Winkle*), which interpreted section 3303, subdivision (i), in support of their contention.

Section 3303 provides various safeguards to public safety officers subject to interrogation by their employers. Subdivision (i) of section 3303 contains an express exception, which states in relevant part: "nor shall *this section* apply to any investigation concerned solely and directly with alleged criminal activities." (§ 3303, subd. (i), italics added.) In interpreting section 3303, subdivision (i), *Van Winkle* held that POBRA's interrogation safeguards did not apply during the investigation of a deputy sheriff by a county's major crimes bureau because the investigation was an independent criminal investigation. (*Van Winkle*, *supra*, 158 Cal.App.4th at p. 501.)

Here a different section of POBRA—section 3304—governs the question of whether and when the statute of limitations accrued. We note at the outset that unlike section 3303, subdivision (i), section 3304 provides no exception from POBRA's statute of limitations "for investigations concerned solely and directly with criminal activities." Rather, section 3304, subdivision (d), provides for exceptions from POBRA's statute of limitations as follows: Subdivision (d)(2)(A) tolls the one-year period while the act, omission, or alleged misconduct is the subject of a pending criminal investigation or prosecution, and subdivision (d)(2)(G) tolls the one-year period when the investigation "involves a matter in criminal litigation" and the complaint of officer misconduct is made by a criminal defendant. This implies that where evidence of misconduct emerges in a criminal case, the Legislature intended that section 3304, subdivision (d), govern the statute of limitations' accrual date and any applicable periods of tolling or extension based on the statutory criteria set forth therein. (See, e.g., *Department of Corrections & Rehabilitation v. State Personnel Bd.* (2016) 247 Cal.App.4th 700, 711.)

For these reasons, we reject appellants' argument based on *Van Winkle* and section 3303 that the statute of limitations does not apply. We now turn to appellants' claim that the trial court erred in finding that Lieutenant DeFilippo was a person authorized to initiate a POBRA investigation of the text messaging misconduct in December 2012.

17

***b. The text messaging misconduct was not discovered by "a person authorized to initiate an investigation" until the text messages were released by the USAO.***

Appellants argue that Lieutenant DeFilippo and Sergeant Minner were not, as the trial court determined, "person[s] authorized to initiate an investigation" (§ 3304, subd. (d)(1)) into respondents' text messaging misconduct at the time of discovery in December 2012. Relying upon the declarations of Chief Suhr and Lieutenant Yick of IAD-Admin submitted in the trial court proceedings below, appellants argue it was SFPD's policy that only IAD-Admin was authorized to initiate disciplinary investigations of SFPD officers. Because the IAD-Admin officers authorized to initiate an investigation did not receive the text messages evidencing potential misconduct until they were released by the USAO to IAD-Admin on December 8, 2014, appellants contend the statute did not accrue until that date.

Respondents contend that under SFPD's General Order 1.06, Lieutenant DeFilippo of the IAD-Crim unit was a "superior officer" authorized to begin an investigation upon his discovery of the text messages in December 2012, and this investigation was independent of any proceedings conducted by IAD-Admin. This authority under General Order 1.06, respondents argue, was merely "supplemented" by the verbal confidentiality order and simply required Lieutenant DeFilippo to consult with the USAO before initiating an investigation.

This issue presents a mixed question of law and fact in which we analyze the meaning of "a person authorized to initiate an investigation" as well as when such person discovered the relevant information. (*Avner v. Longridge Estates* (1969) 272 Cal.App.2d 607, 617 [whether cause of action accrued is mixed question of law and fact].) In interpreting section 3304, "we apply basic principles that apply in all statutory construction cases. We seek to ascertain the Legislature's intent so that we may effectuate the law's purpose. Our goal is to interpret the language of the statute—not to insert what has been omitted or omit what has been inserted. We look first to the language of the statute itself, read as a whole, seeking to harmonize all parts of the

18

statutory scheme. If the words contained in the statute are reasonably free from ambiguity and uncertainty, we look no further than those words to ascertain the provision's meaning. [Citations.] Only if the words are ambiguous or unclear may we turn to extrinsic aids to help us determine the Legislature's intent. [Citation.]" (*Breslin*, *supra*, 146 Cal.App.4th at p. 1079.)[8]

Looking to the statutory language itself, we note that section 3304, subdivision (d)(1), triggers the statute of limitations upon discovery within a public agency by a person authorized to initiate an investigation. The reasonable implication from this language is that the statute of limitations is not triggered upon any employee's discovery, but upon discovery by persons who are either specifically or generally vested with the authority to commence an investigation into the misconduct. Given that a public law enforcement agency may employ many individuals and have multiple divisions and levels of leadership, it is significant to us that the language of section 3304, subdivision (d)(1), ties the accrual of the statute to discovery by persons within a public agency who are authorized to initiate investigation of the pertinent information.

Appellants argue that the power to designate persons authorized to initiate disciplinary investigations belongs to the law enforcement agency, and here, SFPD designated the officers assigned to IAD-Admin as authorized to initiate investigations of misconduct by SFPD officers. Appellants contend the trial court erred as a matter of law when it disregarded SFPD's designation. Respondents counter that under *Jackson v. City of Los Angeles* (2003) 111 Cal.App.4th 899 (*Jackson*), courts favor a more expansive definition of who is authorized to initiate an investigation, such as the authorization

---

[8] We previously deferred ruling on appellants' request for judicial notice of legislative history materials for section 3304. Because we find the statute's language to be unambiguous, we deny the request for judicial notice as not relevant to a material issue in this case. (*Moraga-Orinda Fire Protection Dist. v. Weir* (2004) 115 Cal.App.4th 477, 482, fn. 4.)

provided in General Order 1.06.[9] The trial court, too, relied on *Jackson* to conclude that Lieutenant DeFilippo was authorized to initiate an investigation into respondents' text messaging misconduct.

*Jackson* notwithstanding, we find that appellants have the more persuasive argument. The issue in *Jackson* was whether the city's charter, as a matter of home rule under the California Constitution, established the limitations period rather than state law. The charter's limitations provision began to run when the disciplinary issue was " 'brought to the attention of the Chief of Police.' " (*Jackson*, *supra*, 111 Cal.App.4th at p. 905.) The court held that because section 3304, subdivision (d), was a matter of statewide concern, it governed over contrary charter provisions. (*Id.* at pp. 906–910.) The court then applied the police department's Administrative Order No. 7 (identifying persons of the rank of "sergeant I or detective II or higher" as those authorized to initiate investigations into misconduct), not because it was broader than the charter provision, but because it was promulgated under the department's "power to formulate procedures to implement the rights and protections in the [POBRA]." (*Id.* at p. 910.)

Viewed in the correct light, *Jackson* actually supports appellants' contention that courts should apply an agency's designation of who is authorized to initiate investigations for purposes of POBRA. (See *Benefield v. Department of Corrections and Rehabilitation* (2009) 171 Cal.App.4th 469, 476 (*Benefield*) [looking to correctional department's operations manual].) *Jackson*'s conclusion was based on case law recognizing that the procedural details for implementing the provisions of POBRA are to be formulated by the local agency. (See *Jackson*, *supra*, 111 Cal.App.4th at p. 910, citing *Caloca v. County of San Diego* (1999) 72 Cal.App.4th 1209, 1223; *Browning v. Block* (1985) 175 Cal.App.3d 423, 429 ["Government Code section 3304 does not specify how its provisions are to be implemented"].) We conclude that law enforcement agencies have latitude to designate

---

[9] Respondents further argue that a more expansive definition would align with the decision of the California State Personnel Board in *In re Russell Brizendine* (Cal.S.P.B., July 8, 2008) Dec. No. 08-02. That decision, however, was premised on the "[a]bsen[ce of] any specific identification or authorization by the appointing power . . . ."

"a person authorized to initiate an investigation" for purposes of section 3304, subdivision (d), and courts should generally apply the agency's designation in determining when the limitations period began to run.

The trial court erred when it dismissed SFPD's designation of IAD-Admin as an "unwritten" practice that should not take "precedence over a statute." There is no conflict between the language of section 3304, subdivision (d)(1), which leaves for agency determination the designation of those persons authorized to initiate investigations of misconduct, and SFPD's enactment of procedures to implement POBRA. Nor is SFPD's unwritten practice inherently suspect. Under General Order 2.01, which sets forth the general rules of conduct for SFPD officers, verbal directives have the same force as written ones, as officers must "promptly obey all lawful written or verbal directives of superiors."

Further, we find the trial court's concern that law enforcement agencies "can initiate, make up, create an unwritten practice when they want to skirt around state law" does not compel a different conclusion. There were no allegations or evidence in this case that SFPD's designation of IAD-Admin as the investigative body for purposes of POBRA was a bogus practice intended to thwart respondents' rights. The evidence was undisputed that the separation of the Internal Affairs Division was the department's consistent policy through Chief Suhr's tenure, as well as during the tenure of his predecessor that began in June 2009, and that it was based on POBRA's criminal investigation tolling provision (§ 3304, subd. (d)(2)(A)) to allow IAD-Crim to complete a criminal investigation before IAD-Admin begins its disciplinary investigation. Lieutenant Yick of IAD-Admin provided further detailed facts regarding the separation of the IAD units and the relevant circumstances in which IAD-Admin members are "walled off" from IAD-Crim.[10] The trial court's concern about hypothetical abuses of

---

[10] This practice is not unique to the SFPD. According to amici curiae League of California Cities and California State Association of Counties, other municipal police departments in California organize their internal affairs divisions in the same manner,

21

unwritten policies was not grounds for disregarding SFPD's procedures implementing POBRA. (See, e.g., *Van Winkle*, *supra*, 158 Cal.App.4th at p. 498 [contention that agencies initiate criminal investigations as shams to conduct disciplinary investigations without POBRA protections was factual issue unsupported by evidence].)

Respondents argue that statutes applying statewide standards such as POBRA cannot be interpreted in ways that turn on local concerns. (See *Breslin*, *supra*, 146 Cal.App.4th at p. 1085.) The cases they cite in support, however, are inapposite. The cited portion of *Berkeley Police Assn. v. City of Berkeley* (2008) 167 Cal.App.4th 385, 400–401 involved the interpretation of the statutes governing the confidentiality of peace officer personnel records, which has no application to the statute at issue here. In *Breslin*, Division Four of this court held that the interpretation of the word "multijurisdictional" in section 3304, subdivision (d)(3), could not be based on the manner in which a local city charter organized its police. (*Breslin*, *supra*, at p. 1085.) However, unlike the statutory language at issue here, the definition of "multijurisdictional" in section 3304, subdivision (d)(3), is not a procedural matter that the Legislature has left to law enforcement agencies to formulate.

### c. *General Order 1.06 did not authorize Lieutenant DeFilippo to initiate an investigation into respondents' text messaging misconduct.*

Next, we consider respondents' contention that General Order 1.06, properly construed, provided authority to officers outside of IAD-Admin, including Lieutenant DeFilippo, to initiate investigations of misconduct. The meaning of this general order presents a question of law for our determination on appeal. (*Bettencourt v. City and County of San Francisco* (2007) 146 Cal.App.4th 1090, 1102.)

General Order 1.06 sets forth the duties and responsibilities of superior and commanding officers. It requires a "superior officer" (defined in the record as "any officer with a rank above police officer") to "[p]romptly report in writing any misconduct

---

separating a criminal section that handles criminal misconduct from an administrative section that deals solely with officer discipline.

22

by subordinates and forward the report to their superiors." Section I(A)(4)(a) provides that any superior officer who becomes aware of possible misconduct *by any member of his/her unit* must notify the "senior-ranking officer" on duty at the unit, and this senior-ranking officer shall "[r]emain personally responsible for the conduct of the matter until relieved of responsibility" and "[c]onduct an administrative investigation in addition to any investigation that may be made by the [Risk Management Office] or the Office of Citizen Complaints. (See DGO 2.08, Peace Officers' Rights)[.]"[11] "When a superior officer becomes aware of possible misconduct by any member assigned to *another* unit, he/she shall . . . [¶] [i]mmediately notify the senior-ranking officer on duty at the member's unit. If the unit is closed, the commanding officer of the unit shall be notified at any time day or night. [¶] The senior-ranking officer or commanding officer (as appropriate) shall be responsible for performing the steps outlined in Section a. above." (Italics added.)

Appellants argue the term "administrative investigation" as used in General Order 1.06 does not refer to a disciplinary investigation subject to POBRA. We disagree. The procedures prescribed in General Order 1.06 require an affected senior-ranking officer to prepare an "initial investigative report" addressed to his or her commanding officer that contains such information as a summary of statements from witnesses, preliminary findings, and recommendations. Given the fact- and evidence-gathering nature of this examination, it is reasonably construed as an inquiry that " '*could* lead to punitive action' " and is therefore an "investigation" for purposes of POBRA. (*Ochoa v. County of Kern* (2018) 22 Cal.App.5th 235, 247–248 (*Ochoa*).) Furthermore, by requiring such investigations "in addition to" those performed by Risk Management and then citing to General Order 2.08 (setting forth "Peace Officers' Rights"), General Order 1.06 is reasonably read as authorizing an independent investigation comparable to

---

[11] General Order 1.06 uses the phrase "Management Control Division" to describe the division of SFPD responsible for conducting internal investigations of misconduct allegations, but that phrase was replaced with "Risk Management Office," which encompasses IAD-Crim and IAD-Admin.

that performed by the office encompassing IAD-Admin and subject to the procedures of POBRA. Thus, we conclude that in addition to officers assigned to IAD-Admin, senior-ranking SFPD officers are authorized to initiate administrative investigations when the misconduct pertains to members of their units.

Nevertheless, our conclusion that General Order 1.06 affords certain senior-ranking SFPD officers authority to initiate administrative investigations requires a factual showing that DeFilippo was such a senior-ranking officer in order for respondents to prevail on this issue. We find no evidentiary support for the conclusion that Lieutenant DeFilippo was the senior-ranking officer of the units to which respondents were assigned for purposes of General Order 1.06. While the term "unit" is not specifically defined in General Order 1.06 or elsewhere in the record, there are repeated references in the briefs and the record to IAD-Crim as an independent unit separate from even IAD-Admin. Most tellingly, respondents have never contended that they were, at any time, members of Lieutenant DeFilippo's unit, and we have found no basis in the record to conclude they were.

Respondents contend that "the IAD-Crim lieutenants possessed the authority to initiate an investigation by consulting with the Federal Authorities and then reporting the text messages pursuant to General Order 1.06, but failed to exercise that authority." We do not believe the ability to report misconduct is synonymous with the authority to initiate an investigation of it for purposes of triggering the limitations period of section 3304, subdivision (d)(1). This conclusion is logically drawn from *Benefield*, *supra*, 171 Cal.App.4th 469. There, the Department of Corrections and Rehabilitation's operations manual stated that " 'serious' misconduct . . . 'shall be reported to the Regional OIA [office of internal affairs], Investigative Lieutenant, Chief Deputy Warden, Warden, Deputy RPA [regional prison administrator], RPA, or Hiring Authority' " and further provided that " 'the Hiring Authority shall request an investigation by the OIA.' " (*Id.* at p. 476.) The court held that even if it could be inferred that a lieutenant (Clarence Vanhoose) was aware of the misconduct on the date it occurred, this did not mean the limitations began to run on the date of the incident since there was no evidence that

Vanhoose held the position of "Hiring Authority" or any other position that gave him the authority to initiate an investigation of the alleged incident. (*Id*. at p. 477.) The *Benefield* court did not interpret the statute of limitations to begin running upon the inferred discovery by Vanhoose, even though he was presumably capable of reporting the misconduct to the Hiring Authority.

Respondents also rely on the recent decision of the Fifth Appellate District in *Ochoa* for the position that a police officer who is required by written rule to report allegations of misconduct but does not have the authority to initiate an internal affairs investigation is nonetheless "a person authorized to initiate an investigation" under section 3304, subdivision (d). *Ochoa* is distinguishable because it involved broader departmental procedures as well as specific factfinding and disciplinary authority that Lieutenant DeFilippo was not shown to possess. In *Ochoa*, the court held that the statute of limitations began to run when a sergeant (Bittle) received a deputy sheriff's interoffice memorandum documenting a citizen's complaint against another deputy and " 'started an investigation' 'to determine what the nature of the complaint was.' " (*Ochoa*, *supra*, 22 Cal.App.5th at pp. 239, 248.) Although Bittle was not authorized to initiate an internal affairs investigation, he was empowered to " 'conduct factfinding' in connection with purported policies and procedures violations to 'determine[] if the allegation[s] [are] criminal or administrative in nature'; and . . . impose certain forms of discipline (e.g., documented oral counseling, written reprimands) when the violations are neither 'serious' nor 'criminal' and do not necessitate an internal affairs investigation." (*Id*. at p. 246.) The applicable policies and procedures provided that " '[a] supervising employee who becomes aware of misconduct on the part of *any member* will [¶] . . . [p]repare a confidential memo' " and forward the memo and supporting documentation to his or her commander. (*Id*. at p. 242, fn. 6, italics added.)

Here, the evidence fails to establish Lieutenant DeFilippo's authority to perform initial factfinding of allegations against "any member" of SFPD to determine if the allegations were criminal or administrative, or to impose discipline on "any member" of SFPD. Rather, as we conclude, General Order 1.06 provided that where alleged

25

misconduct pertained to members of units other than Lieutenant DeFilippo's, he was required to "notify" the senior-ranking officers of those members' units and "report" the misconduct to his superiors, leaving the *investigation* of the misconduct (e.g., factfinding, gathering witness statements) to the affected senior-ranking officer or commanding officer.[12]

For these reasons, we find that Lieutenant DeFilippo and Sergeant Minner were not authorized to initiate an investigation into respondents' text messaging misconduct in December 2012. The same is true for Lieutenant Jean when she joined IAD-Crim in June 2013. The trial court's contrary conclusions were erroneous as a matter of law or not supported by substantial evidence.

### d. *The federal authorities' confidentiality restriction prevented disclosure of the text messaging misconduct.*

In all events, even if we accepted respondents' contention that Lieutenant DeFilippo possessed the authority to initiate a POBRA investigation by reporting the text messaging misconduct pursuant to General Order 1.06, we conclude that this authority was revoked when SFPD agreed to the confidentiality restrictions imposed by the USAO.

As set forth above, at the outset of the joint criminal investigation, SFPD's command staff agreed to the USAO's requirement that IAD-Crim officers assisting in the corruption investigation would maintain confidentiality throughout the investigation. Lieutenant DeFilippo was chosen as the designated "firewall" beyond whom no information about the case would be disclosed. Notably, this arrangement was made well before the text messages were discovered, and the discovery of the text messages did not

---

[12] As for Lieutenant DeFilippo's duty to report, General Order 2.01 prohibited him from divulging any information or engaging in any conduct that may compromise an investigation or prosecution, and from divulging any information made confidential by law or by department policies and procedures. The USAO's confidentiality directive was a department policy, as SFPD's command staff ordered Lieutenant DeFilippo and other IAD-Crim officers assisting in the corruption investigation to obey the USAO's instructions expressly prohibiting them from disclosing any information or evidence from the corruption investigation to others in SFPD, including IAD-Admin and command staff.

alter the restriction on information-sharing. The text messages belonged to the federal corruption investigation and remained subject to a federal protective order in the *Furminger* case.

Respondents argue that there was no absolute prohibition on disclosures by the SFPD under the language of the agreement. Highlighting the word "expected" from AUSA Caputo's declaration, respondents suggest the confidentiality restriction was something less rigorous than an order. When the evidence is viewed in its proper context, we have no trouble concluding the trial court's finding lacks substantial support in the record. First, we note that in his declaration, AUSA Caputo described the "restrictions" and "confidentiality obligations" that the USAO placed on the sharing of any materials from the ongoing criminal investigation, as well as the fact that "no violation of these confidentiality obligations would be tolerated." Moreover, Lieutenant DeFilippo testified that AUSA Caputo "actually threatened to charge me if I released any information, so I didn't." SFPD command staff ordered Lieutenant DeFilippo and the other IAD-Crim investigators to keep all evidence and details about the investigation completely confidential, and Lieutenants DeFilippo and Jean and Sergeant Minner all testified that they were not permitted to disclose information about the corruption investigation. Respondents' reliance on a snippet of testimony taken out of context does not constitute substantial evidence that the confidentiality restriction was less than a prohibition on disclosure.

Respondents also cite two instances during the corruption investigation in which Lieutenant DeFilippo purportedly "exercised his authority to initiate misconduct investigations as a result of information obtained" and "sought and received approval from the USAO to report developments in the criminal investigation so that they could be investigated by SFPD administratively." We have reviewed the cited portions of the record and find that neither of these instances involved Lieutenant DeFilippo's exercise of authority nor his initiation of administrative investigations. In one instance, it was AUSA Caputo who called a meeting with the deputy chief and a captain to discuss a perjured police report. In the other cited instance, Lieutenant DeFilippo received

permission from AUSA Caputo to recommend to Chief Suhr that two officers (not any of respondents) be removed from public contact. Significantly, AUSA Caputo did not permit Lieutenant DeFilippo to disclose the circumstances justifying the officers' removal, and there was no evidence of an administrative investigation of these officers at this time.

Even viewing this evidence in a light most favorable to respondents, we find at best the reasonable inference drawn from this evidence is that the USAO might have permitted Lieutenant DeFilippo to recommend to Chief Suhr that respondents be removed from public contact. We find it significant that Lieutenant DeFilippo had to ask for such permission, which underscores his lack of authority to act on the information on his own. Furthermore, it is pure speculation, on this record, that the USAO would have also permitted a full administrative investigation into respondents' text messages while the corruption case was pending in that institution of an administrative investigation may have alerted Furminger and his codefendants that their communications were being monitored, potentially compromising the corruption investigation. A reasonable inference from the evidence may not be based on such speculation or conjecture. (See *People v. Sanford* (2017) 11 Cal.App.5th 84, 91–92 (*Sanford*); *Kuhn*, *supra*, 22 Cal.App.4th at p. 1633.)

We also reject the trial court's conclusion that an investigation was no longer prohibited for confidentiality purposes after the indictments, because, according to the trial court, the need for secrecy had "vanished" and "the cat was out of the bag" once Furminger and his coconspirators were aware that they were under investigation. These points do not negate the fact that the USAO's confidentiality restriction remained in effect after the indictments. According to AUSA Villazor, he instructed IAD-Crim investigators at the outset of his involvement in the case (just before the indictments) to maintain the confidentiality of the text messages "until the return of a verdict[.]" The text messages belonged to the federal investigation and were subject to a federal protective order that restricted their disclosure and use. Having agreed to the confidentiality

28

restriction in advance of the joint investigation led by the USAO, it was not for SFPD to decide when the restriction no longer applied.[13]

The trial court posited that Lieutenant DeFilippo could have sought relief from the confidentiality obligations in court. Again, however, this merely underscores Lieutenant DeFilippo's lack of authority to act on his own. Furthermore, we can only speculate as to whether Lieutenant DeFilippo would have prevailed in such litigation while the corruption case was pending, and speculation does not support a reasonable inference that he was authorized to initiate an investigation at that time. (See *Sanford*, *supra*, 11 Cal.App.5th at pp. 91–92; *Kuhn*, *supra*, 22 Cal.App.4th at p. 1633.)

Respondents argue it would eviscerate the benefits of section 3304, subdivision (d)(1), to allow "the unfettered use of verbal directives to just make up the rules as they go along, and de-authorize people whenever it suits their fancy so that the employer can remain technically ignorant of misconduct until whenever they decide it is convenient to take action . . . ." On the record actually before us, however, there was no such abuse. SFPD's adherence to the confidentiality obligations was not an arbitrary or abusive act in violation of respondents' POBRA rights. (See *Pasadena Police Officers Assn.*, *supra*, 51 Cal.3d at p. 577.)

---

[13] We pause to address a November 2014 email in the record in which AUSA Villazor appeared to disclose text message excerpts between Furminger and a prosecution witness to members of IAD-Admin and alluded to further disclosures regarding the offensive text messages. Because this email was sent several weeks before the *Furminger* verdict, the trial court could have reasonably viewed it as inconsistent with appellants' claim that confidentiality of the text messages was strictly maintained. Nevertheless, AUSA Villazor's exercise of discretion to release some of the text messages during the *Furminger* trial does not reasonably lead to the conclusion that IAD-Admin was able to conduct a full disciplinary investigation of the text messaging misconduct at an earlier date. It is otherwise apparent from the record that despite requests from IAD-Admin, the FBI and USAO did not share the criminal discovery materials (including Furminger's text messages) with IAD-Admin at any time prior to November 2014. Therefore, even assuming the statute of limitations began to accrue in November 2014, the April 2015 disciplinary proceedings were still timely.

Thus, we conclude the trial court erred in finding that the statute of limitations accrued in December 2012, when IAD-Crim, as part of the investigation headed by USAO, became privy to the text messages. To the contrary, the record here reveals the statute did not begin to accrue until late 2014, upon IAD-Admin's receipt of the records turned over by the USAO and IAD-Crim. After OCC notified SFPD of their discovery of some of the offensive text messages in January 2015, the IAD-Admin investigators began focusing their inquiry on respondents' text messages and conducted interviews. All notices of disciplinary proceedings were served by April 22, 2015, less than five months after the text messages were released to IAD-Admin. Thus, the investigation was completed and respondents were timely notified of the proposed discipline within a year of SFPD's discovery by persons authorized to initiate the administrative investigations of respondents' text messaging misconduct.

We have thus far discussed why the statute of limitations did not begin to accrue until late 2014, which by itself supports reversal of the trial court's ruling below. In the ensuing discussion, we will also address the tolling provision of section 3304, subdivision (d)(2)(A).

> ### e. The limitations period was tolled while the text messaging misconduct was the subject of a pending criminal investigation and prosecution.

Section 3304, subdivision (d)(2)(A), provides, "If the act, omission, or other allegation of misconduct is also the subject of a criminal investigation or criminal prosecution, the time during which the criminal investigation or criminal prosecution is pending shall toll the one-year time period." Where the statutory criterion is met, tolling under section 3304, subdivision (d)(2)(A), is mandatory. (*Breslin*, *supra*, 146 Cal.App.4th at p. 1078.) "The tolling provision recognizes that investigation of a case for possible criminal prosecution, in which guilt must be established by proof beyond a reasonable doubt, normally would be more time-consuming than an ordinary investigation into noncriminal misconduct. The criminal investigation should not have to bear the pressure of being rushed to completion because of the one-year deadline for

30

disciplinary investigations . . . ." (*Lucio v. City of Los Angeles* (2008) 169 Cal.App.4th 793, 800 (*Lucio*).)

Citing *Parra*, *supra*, 144 Cal.App.4th 977, the trial court held that tolling under section 3304, subdivision (d)(2)(A), did not apply because respondents, their conduct, and their text messages were not the subject of a criminal investigation and prosecution. At the hearing, the court remarked that "in the *Parra* case, tolling was okay because the criminal investigation involved the exact self [*sic*] same facts at issue in the conduct case. [¶] . . . [¶] That 3304(d)2(A) [*sic*], it only applies if there's a criminal investigation or prosecution where they're the same facts."

In *Parra*, three off-duty officers were accused of assaulting citizens, and seven other officers were accused of conspiring to obstruct justice in their handling of the incident. The district attorney indicted all 10 officers, but the conspiracy indictments against the seven officers were eventually dismissed by the trial court. (*Parra*, *supra*, 144 Cal.App.4th at p. 981.) Thereafter, noncriminal disciplinary charges (e.g., "discredit for making improper comments during a pending investigation," "neglect of duty for failing to conduct a prompt and proper investigation") were brought against the seven officers. (*Id.* at p. 987.) Our colleagues in Division Two held that the limitations period for bringing disciplinary charges against the seven officers was tolled until the day the indictments were dismissed because "the criminal investigation encompassed the misconduct of all officers who were involved in connection with the incident . . . ." (*Id.* at p. 994.) " '[T]he criminal investigation included all of the conduct, indeed the very allegations at issue in these administrative proceedings.' " (*Ibid.*)

In our view, *Parra* involved a straightforward application of the tolling provision. However, its holding does not support the rule that respondents argue here and which the trial court adopted—that the conduct involved in the criminal and administrative investigations must be the same. To the contrary, *Parra*'s ultimate holding that tolling applies where the criminal investigation "include[s]" or "encompasse[s]" the conduct in the administrative proceedings suggests a broader interpretation that would support tolling in the instant case. (*Parra*, *supra*, 144 Cal.App.4th at p. 987.) *Parra* also

31

demonstrates that tolling is available even if the conduct at issue in the administrative proceedings is a noncriminal violation of departmental rules, which also applies to the instant matter.

Other cases have applied the tolling provision of section 3304, subdivision (d)(2)(A), in circumstances like those we confront here. In *Richardson*, an SFPD officer was accused of conducting unauthorized searches on the department's CLETS computer system.[14] SFPD's management control division (MCD) forwarded the matter to the special investigations division (SID). Several weeks later, the SID advised the MCD that the officer " 'is under investigation by Antioch Police Department for allegations of theft by check fraud and it was believed that the unauthorized computer usage was linked. After conferring with Antioch PD, it is apparent that the two cases are not linked and are separate incidents.' " (*Richardson*, *supra*, 214 Cal.App.4th at p. 675.) Thus, the SID concluded it would not conduct a criminal investigation into the CLETS misuse. The Antioch Police Department's check fraud investigation was eventually turned over to another police department, and the district attorney ultimately declined to prosecute. (*Id.* at pp. 676–677.) SFPD brought disciplinary charges against the officer for the CLETS misuse over a year after receiving the CLETS-related complaint, and brought additional disciplinary charges related to the check fraud incident nearly two years after learning of the check fraud investigation by Antioch police. The *Richardson* court held that the limitations period for bringing disciplinary actions was tolled during the SID's investigation, noting that the officer's CLETS searches were investigated for "any possible connection to the check fraud . . . ." (*Id.* at p. 694.) The court also held the limitations period was tolled during the police departments' investigations of the check fraud incident until the district attorney declined to prosecute. (*Id.* at pp. 695–698.)

_____

[14] "CLETS—the California Law Enforcement Telecommunications System—is a confidential law enforcement database that allows police officers to access an individual's criminal history, as well as driver's license and vehicle registration information." (*Richardson*, *supra*, at p. 674, fn. 1.)

In *Lucio*, a police officer (Lucio) began an intimate relationship with a woman (Jenna K.) he met while on duty. Jenna K. later reported to internal affairs that Lucio had threatened her, and she was interviewed by an internal affairs criminal investigator. Several months later, however, it was determined that there was no prima facie case to be presented to criminal prosecutors. (*Lucio*, *supra*, 169 Cal.App.4th at p. 796.) More than a year after Jenna K.'s first report to internal affairs, Lucio was served with an administrative complaint for, among other counts, inappropriately converting an official on-duty contact into a social relationship and conducting personal business while on duty. The *Lucio* court held that even though these counts did not allege criminal wrongdoing, tolling applied[15] because the investigating officer learned of the noncriminal misconduct "in his interview with Jenna K., conducted as part of the criminal complaint investigation, about the circumstances surrounding Lucio's conversion of an on-duty contact with Jenna K. into a social relationship (count one), [and] how the relationship developed and then deteriorated to the point where, according to Jenna K., Lucio threatened her life." (*Id.* at p. 801.)

Based on our reading of the statute and relevant case law, we conclude that respondents' text messaging misconduct was a "subject" of the criminal investigation and prosecution within the meaning of section 3304, subdivision (d)(2)(A). Notably, this was a criminal conspiracy case in which the investigators sought to ascertain the full scope of the conspiracy by identifying persons of interest, gathering information on them, and winnowing the list down as each individual's involvement became clear. The text messages were a key investigative tool to aid in this effort because the investigators knew that Furminger, the central figure in the corruption scheme, conducted criminal activity via text messaging. Respondents' text messages were obtained through search warrants

---

[15] Although *Lucio* involved interpretation of a city charter tolling provision, the provision was almost identically worded to section 3304, subdivision (d)(2)(A), and the *Lucio* court relied on decisions interpreting section 3304, subdivision (d), as consistent with its interpretation of the charter provision. (*Lucio*, *supra*, 169 Cal.App.4th at pp. 800, 802.)

33

of Furminger's cellphone, and corruption investigators examined the text messages obtained by the search warrants for evidence of Furminger's relationships, associates and accomplices.

Even though respondents' text messages did not contain evidence of criminal activity, the content of these messages—particularly the offensive language that ultimately led to disciplinary charges—was noted as showing a comfort level with Furminger that went beyond merely a professional relationship and made them persons of interest to the corruption investigators. It was entirely reasonable, particularly in the midst of an investigation to uncover a broad conspiracy among police officers, for the corruption investigators to view this conduct with suspicion, and suggestive of the possibility that respondents were willing to engage in criminal conduct with Furminger. That respondents were not "subjects" of the corruption investigation as that term is understood in the law enforcement context (e.g., more than a witness and within the scope of the grand jury investigation, but not a "target") does not compel a different conclusion. The tolling provision of section 3304, subdivision (d)(2)(A), focuses on conduct, not individuals, and the cases discussed above make clear that the conduct need not rise to the level of criminality in order for tolling to apply. As in *Richardson*, respondents' text messages were examined for "possible connection" between respondents and those involved in the criminal conspiracy, and as in *Lucio,* respondents' text messaging misconduct emerged during an investigation of other alleged criminal conduct. At the very least, the record demonstrates a clear connection between respondents' text messaging conduct and the aims of the corruption investigation.

Our conclusion that the tolling provision applies also comports with a time-honored maxim of statutory interpretation: In interpreting statutory language, "we may reasonably infer that the legislators intended an interpretation producing practical and workable results rather than one resulting in mischief or absurdity." (*City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 919.) It would result in mischief to interpret section 3304, subdivision (d)(2)(A), as requiring SFPD to initiate a disciplinary

investigation that would have revealed the existence of respondents' text messages and risked compromising the corruption investigation.

Respondents contend that even if the tolling provision was applicable, "tolling ended on the date that the criminal investigation ended as to all officers who were not the subject of the criminal prosecution, which was the indictment date of February 25, 2014." We disagree, as there was no evidence of a formal end to the corruption investigation. (See, e.g., *Richardson*, *supra*, 214 Cal.App.4th at p. 698 [district attorney advised police department it was declining to prosecute]; *Lucio*, *supra*, 169 Cal.App.4th at p. 796 [internal affairs criminal section determined there was no prima facie criminal case to present to prosecutors]; *Breslin*, *supra*, 146 Cal.App.4th at p. 1070 [district attorney announced completion of criminal investigation]; *Parra*, *supra*, 144 Cal.App.4th at p. 990 [indictments for criminal conspiracy dismissed].) To the contrary, appellants submitted evidence that the investigation was active and continued to evolve, and the investigators continued to investigate leads, interview potential witnesses and gather evidence for the case through the *Furminger* trial. The fluidity of the investigation is demonstrated by the fact that Vargas accepted a plea bargain and began providing investigators with new evidence in the postindictment period.

Respondents point out that no investigative steps were taken related to the text messages exchanged between respondents and Furminger, and most of the respondents were never interviewed by the corruption investigators. However, as discussed above, it is sufficient for purposes of section 3304, subdivision (d)(2)(A), that the text messages were examined by corruption investigators for a possible connection to the corruption scheme. Parsing the degree of activity performed by the investigators as the investigation transpired is not germane to this analysis.

This was the conclusion of our colleagues in Division Two in *Richardson*, which held there is no requirement that a criminal investigation be shown to be "actual and active" in order to be "pending" for purposes of section 3304, subdivision (d)(2)(A). (*Richardson*, *supra*, 214 Cal.App.4th at pp. 697–698.) The court reasoned that not only is such a requirement nowhere to be found in the statute, but it would also be

35

"unworkable" because it " 'would require a police department's disciplinary investigators, and later the courts, to monitor and oversee each step of a separate criminal unit's investigation to determine whether the investigation is sufficiently "active" to invoke section 3304(d)(2).' " (*Ibid*.) The court held it was particularly unworkable in that case because the criminal investigation was conducted in another county. (*Id*. at p. 698.) The court also held that an "active and actual" requirement was an uncertain standard because it left unanswered how much an investigator must do, and how frequently, to maintain an "active" investigation that triggers tolling. (*Ibid*.)

Likewise, the corruption investigation in this case was led by an outside law enforcement agency that made the decisions on who to bring charges against, and this federal agency, who owned and controlled the evidence collected in the corruption investigation (including the text messages), maintained the confidentiality restriction even after the indictments issued. We, like the *Richardson* court, question where a line could workably be drawn to conclude that an investigation of particular persons of interest was no longer pending due to investigative inactivity. Practically speaking, the ebb and flow of activity in a criminal case, particularly an investigation involving a broad conspiracy, precludes a definitive standard. Even in *Richardson*, which involved a fraud investigation of a single officer, the case activity fluctuated. At one point, the investigating detective indicated in a September 2007 report to the district attorney that the case was " 'Closed' " but was reopened several weeks later in November, and then in a December 2007 supplemental report, the case was identified as " 'Closed' " once again. (See *Richardson*, *supra*, 214 Cal.App.4th at pp. 676–677.) Yet, the *Richardson* court found that the investigation was still pending for tolling purposes until the district attorney formally advised the police department in December 2008 that it was declining to prosecute. (*Id.* at p. 690.) We apply *Richardson* to conclude that tolling in this case continued after the indictments and until the *Furminger* verdict because the investigation was still pending for purposes of section 3304, subdivision (d)(2)(A).

Finally, we also find it significant to our analysis that throughout the investigation and prosecution of Furminger and his codefendants, the text messages remained subject

to a federal protective order. Given that the disclosure and use of the text messages was governed and restricted by this order issued in the *Furminger* case, the text messaging misconduct is reasonably viewed as a "subject" of that case within the meaning of section 3304, subdivision (d)(2)(A).

In all, the POBRA statute of limitations was suspended for approximately two years. The IAD-Crim officers discovered the offensive text messages in or around December 2012 when the criminal investigation was already underway. Tolling immediately began in December 2012 because, as discussed above, the text messaging misconduct was a "subject" of that investigation. As mentioned, the investigation did not formally end, and it continued until the *Furminger* trial, which came to end on December 5, 2014, at which time, tolling also ended. Respondents were notified of the disciplinary charges by April 2015, well within one year of the *Furminger* verdict.

For all of these reasons, we find that the tolling provision of section 3304, subdivision (d)(2)(A), provides an alternative basis for concluding the disciplinary charges against respondents were timely. The trial court's contrary conclusion was based on an erroneous application of *Parra* and section 3304, subdivision (d)(2)(A), and must be reversed.

We believe our conclusion here comports with the balance that POBRA seeks to strike between the public's interest in maintaining the integrity and efficiency of the police force with the individual officer's interest in receiving fair treatment. (See *Richardson*, *supra*, 214 Cal.App.4th at pp. 691–692.) There is no doubt that the public's interest in the integrity of SFPD was undermined by the offensive text messages. The attitudes reflected in these messages displayed unacceptable prejudice against members of the communities SFPD is sworn to protect. There is also no question that respondents were entitled to fair treatment and a speedy disciplinary process, subject, however, to the statutory criteria and exceptions set forth in POBRA. The exceptions, in particular, underscore the Legislature's recognition that, in light of the realities and importance of investigating officer misconduct, investigations may take longer than one year to complete. The instant matter involved such a situation, and the evidence did not show

unfair, dilatory, or arbitrary actions on the part of SFPD. Rather, SFPD cooperated with federal authorities by adhering to the USAO's confidentiality restriction and a federal protective order during the pendency of a wide-ranging criminal investigation aimed at uncovering the full scope of a conspiracy within the department's ranks. For disciplinary proceedings to wait until the completion of this investigation was fully in keeping with the system that the Legislature created in POBRA.

## DISPOSITION

The order granting the petition for writ of mandate and complaint for extraordinary relief is reversed, and the case is remanded for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.

_____
Jenkins, J.

We concur:


_____
McGuiness, Acting P.J.[*]


_____
Pollak, J.

A145863 & A147385/*Daugherty v. City & County of S.F.*

---

[*] Retired Presiding Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 6/22/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RAIN O. DAUGHERTY et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>    Defendants and Appellants. | A145863, A147385<br><br>(City & County of San Francisco Super. Ct. No. CPF-15-514302)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION; NO CHANGE IN JUDGMENT |

THE COURT:

The opinion in the above-entitled matter filed on May 30, 2018, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Date:  June 22, 2018                          Pollak, J          , Acting P.J.

40

A145863, A147385/Daugherty v. City & County of S.F.

Trial Court:   Superior Court of San Francisco City & County

Trial Judge:   Ernest H. Goldsmith, J.

Counsel:      Dennis J. Herrera, City Attorney, Katharine Hobin Porter, Chief Labor Attorney, Kenneth M. Walczak, Deputy City Attorney, for Appellants.

Jones & Mayer, Martin J. Mayer, James R. Touchstone and Paul R. Coble for California State Sheriffs' Association and California Police Chiefs Association, as Amici Curiae on behalf of Appellants.

Richard Doyle, City Attorney (San José), Nora Frimann, Assistant City Attorney and Kathryn J. Zoglin, Senior Deputy City Attorney, for League of California Cities and California State Association of Counties, as Amici Curiae on behalf of Appellants.

Berry Wilkinson Law Group and Alison Berry Wilkinson; Moskovitz Appellate Team and Myron Moskovitz for Respondent Rain O. Daugherty.

Law Offices of Anthony J. Brass and Anthony J. Brass for Respondent IAD 2015-0036.

Rains Lucia Stern, Rains Lucia Stern St. Phalle & Silver, Michael L. Rains for Respondent IAD 2015-0076.

Law Offices of Christopher Shea and Christopher Shea for Respondents IAD 2015-0078, IAD 2015-0079, and IAD 2015-0082.

Murphy, Pearson, Bradley & Feeney, James A. Lassart for Respondent IAD 2015-0083.

Rains Lucia Stern, Rains Lucia Stern St. Phalle & Silver, Julia Fox for Respondent IAD 2015-0084.

Burrell Law Office and Scott C. Burrell for Respondent IAD 2015-0087.